IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RAYMOND D. BERTUZZI,**                    Case No. 3:16 CV 1897

      Petitioner,                    Chief Judge Patricia A. Gaughan

      v.                    Magistrate Judge James R. Knepp, II

**CHAE HARRIS,**

      Respondent.                    REPORT AND RECOMMENDATION

## INTRODUCTION

*Pro se* Petitioner Raymond D. Bertuzzi ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Chae Harris[1] ("Respondent") filed an Answer/Return of Writ (Doc. 12) and Petitioner filed a Reply/Traverse (Doc. 19).[2] The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated August 31, 2016). For the reasons discussed below, the undersigned recommends the Petition be denied.

## FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by

---

1. Petitioner properly named Chae Harris as Respondent at the time of filing. (Doc. 1). However, Petitioner is now incarcerated at the Trumbull Correctional Institution. *See* Doc. 20. The Warden of that institution is Charmaine Bracy, who is now the proper party Respondent in this case as she currently has custody of Petitioner. *See* Rule 2(a), Rules Governing Section 2254 Cases.
2. Parties and Courts commonly use the terms "Return of Writ" and "Traverse" to refer to what the Rules Governing Section 2254 Cases now term an "Answer" and "Reply." *See* Rule 5, Rules Governing Section 2254 Cases.

clear and convincing evidence, erroneous factual findings by the state court. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. Here, the Ohio Third District Court of Appeals set forth the following facts:

### Trial Testimony

{¶ 7} At trial, the State presented 40 witnesses before resting. Bertuzzi did not present any evidence. The relevant testimony is discussed below. The first witness for the State was DeMerrill Knaul ("Knaul"). Knaul testified that she is a dispatcher for the Marion City Police Department. Tr. 233. On February 8, 2012, Knaul received calls about someone being dead at 617 Bartram Avenue. Tr. 234. The call was placed by Tiffany Wertz ("Wertz"), who was not at the scene. Tr. 235. This call was received at 5:22 p.m., officers were dispatched to the scene at 5:23 p.m., and the first officer arrived on scene at 5:26 p.m. Tr. 238.

{¶ 8} The second witness for the State was Wertz. Wertz testified that she lived at 380 Thomspon [sic] with her mother, her brother, her children, and her uncle. Tr. 240. Her sister is Sarah Smith ("Smith"), who lived at the house on Bartram, and Aldrich was Wertz's cousin. Tr. 240. Aldrich was in town because she had a court hearing regarding child support on February 8. Tr. 242. In the evening of February 8, her nephew, Zachary Gullett ("Gullett"), came in her house and just stood there not saying anything. Tr. 243. Due to it being a bad day, Wertz yelled at Gullett asking him why he was just standing there and not saying anything. Tr. 243–44. After being questioned by Wertz multiple times, Gullett told her that Aldrich was dead. Tr. 245. Wertz thought Gullett was joking, but eventually realized he was not because of how he was reacting. Tr. 246–47. Gullett eventually told her that Aldrich had been shot. Tr. 248. Gullett told her that Smith was at the store, but Aldrich was at the house and was alone. Tr. 249. Wertz then called 9–1–1 and spoke with the dispatcher. Tr. 249.

{¶ 9} On cross-examination, Wertz testified that Aldrich had obtained a protection order against Cook. Tr. 259. Aldrich had been worried about Cook's behavior in the past. Tr. 259. Wertz also testified that she mentioned the names Joey Miller ("Joey") and Lisa Miller ("Lisa") to the dispatcher because Lisa was Cook's sister and Joey was her husband and they lived next door to Smith, where Aldrich was killed. Tr. 260.

{¶ 10} The third witness for the State was Gullett. Gullett testified that he lived at 617 Bartram in Marion, Ohio with his mother, his two brothers, and his sister. Tr. 286. On February 7, 2012, his mother's cousin, Aldrich, came to spend the night. Tr. 287. On February 8, 2012, Gullett returned home from school at around 3:25

p.m. Tr. 288. When Gullett arrived home, he started talking to Aldrich and his mother. Tr. 289. That same day, he observed Cook in front of Joey and Lisa's home, which was next door to his home. Tr. 290. Gullett overheard Aldrich telling his mother that Cook was texting her and telling his mother what the texts said. Tr. 291. At one point in time, Aldrich sent Gullett to a nearby convenience store to purchase some beverages. Tr. 292–93. Gullett arrived at the store and made his purchase at 4:41 p.m. according to the store receipt. Tr. 299. When Gullett returned from the store, the only person in the home was Aldrich. Tr. 299. Gullett then sat down and started watching a movie with Aldrich. Tr. 300.

{¶ 11} Eventually, Gullett went into the kitchen to get a drink. Tr. 300. While he was in the kitchen, Gullett heard the front door slam open and someone enter the house. Tr. 301. Gullett then heard "loud noises that sounded like loud firecrackers." Tr. 301. Gullett was unable to recall how many noises he heard. Tr. 301. Gullett saw the person, but not the person's face because they had a hood up. Tr. 301. Gullett was unable to say if the person was wearing a jacket with a hood or a hoodie, but described it as black. Tr. 302. The assailant was a white male. Tr. 302. The assailant was wearing dark blue jeans with white Jordan tennis shoes. Tr. 303. The assailant had a black pistol, similar to "the ones cops usually carry around." Tr. 305.

{¶ 12} Gullett also described the layout of the home. When a person walks into the home, they enter into the living room, but there is a large opening into the kitchen. Tr. 308. At the time the shooter entered the house, Aldrich was in a chair against the wall. Tr. 310. The shooter was only in the home for a short time and did not say anything. Tr. 311 As the shooter left the house by the front door, he was still shooting into the house. Tr. 312. Gullett then looked out the front door, saw the car door shut, and saw the shooter leave "pretty fast". Tr. 312, 314. The car was parked in front of a neighbor's house. Tr. 314. Gullett was able to identify the vehicle as being silver and being similar to one he had seen in front of Joey and Lisa's house on a previous occasion. Tr. 315.

{¶ 13} Once the vehicle was gone, Gullett went to check on Aldrich. Tr. 315. Aldrich was still in the chair, but she had a "knot-type thing with a bunch of blood and tissue looking stuff coming out of it" on her forehead. Tr. 316. Gullett tried to grab Aldrich's phone, but it was bloody, so he grabbed his bike, left the house, and rode to his grandmother's house. Tr. 317–20. When Gullett got to his grandmother's home, he saw Wertz and his little cousin in the house, and he then knocked on the door. Tr. 322. Eventually he was able to tell Wertz that Aldrich was dead and had been shot in the head. Tr. 323. Wertz then called 9–1–1 and eventually handed the phone to him so he could speak with the dispatcher. Tr. 324.

{¶ 14} The police arrived at his grandmother's home and took him to the station for more questioning. Tr. 324–25. The officers showed him photos of vehicles, but he was not able to identify one. Tr. 325–26. Then Smith drove Gullett around and he was able to pick out a similar looking vehicle. Tr. 326. Gullett admitted that he

ran into his uncle on the way to his grandmother's home and spoke with him, but did not tell him what had happened. Tr. 321. However, he testified that he did not tell his uncle because the uncle has mental health issues. Tr. 329. Gullett also testified that although he did not remember being shot at, he was hit by a fragment of something. Tr. 329–30. After the shooting there was a hole in the refrigerator that had not previously been there. Tr. 330.

{¶ 15} On cross-examination, Gullett testified that he had told the police on the day of the shooting that the shooter had been wearing a black hoodie, and had been holding the black gun in his left hand. Tr. 332. Gullett also admitted that he told the officer that he did not know what kind of shoes the assailant was wearing. Tr. 338. When questioned about the gun being a nine millimeter, Gullett admitted that the only guns he knows are nine millimeters and revolvers. Tr. 339. Gullett admitted that he did not know what type of car the "get-away" car was. Tr. 341. Gullett did recall having seen some woman previously driving the "get-away" car with Lisa in it and Lisa was getting heroin from her. Tr. 342.

{¶ 16} Lieutenant Chris Adkins ("Adkins") of the Marion City Police was the fourth witness for the State. Tr. 344. At the time of the shooting, Adkins was on patrol. Tr. 345. On February 8, 2012, Adkins was dispatched at around 5:24 p.m. to 617 Bartram in Marion, Ohio. Tr. 346–47. When he arrived on the scene, he saw several people on the neighboring porches and a woman on the front porch of 617 Bartram screaming into the phone. Tr. 347. That woman was later identified as Smith. Tr. 348. Smith told him that her cousin had been shot, and helped him to get in the house, because the door was stuck. Tr. 349. The victim was sitting in a chair approximately six to seven feet inside the house. Tr. 349. The victim was identified as Aldrich. Tr. 350. According to Adkins, she was obviously deceased, but he called a squad to confirm that observation. Tr. 351. Officer Matt Creps ("Creps") then arrived and they cleared the house to ensure there were no other victims. Tr. 351.

{¶ 17} Adkins testified that after clearing the home, they observed Aldrich. Tr. 351–52. Aldrich was sitting in the chair with her head "hunched over", her legs straight, and her hands on her lap. Tr. 352. In her hand was her cell phone and the television was operating. Tr. 352. As they investigated the scene, they observed that the refrigerator and freezer doors were open. Tr. 353. After the house was preliminarily examined, Adkins ordered the officers to tape off the area and he stood by the door until the paramedics arrived. Tr. 353–54. The paramedics eventually arrived and detected no signs of life. Tr. 355.

{¶ 18} Once they began investigating the scene in depth, Adkins was primarily just supervising. Tr. 356. He did search for bullet holes and found one in the side of the refrigerator. Tr. 356–57. No casings were found at the scene. Tr. 357. The only other action Adkins took was to drive timed routes at the request of the detectives. Tr. 371. The first route was from Speedway on Bellefontaine Avenue to Bartram Ave. Tr. 371. The time for the first route was five minutes and seven seconds, driving the speed limit. Tr. 373. The second route he drove was from Bartram

Avenue to McDonald's on North Main Street, which took approximately two minutes. Tr. 374. Later, Adkins was asked to drive a third route from McDonald's on North Main Street to the Speedway on Bellefontaine Avenue. Tr. 375. The time for that route was six minutes and 22 seconds. Tr. 375. A fourth route was from Bartram Avenue to an alley between Lead and Fahey Street. Tr. 375–76. That route took one minute and 45 seconds. Tr. 376. Then from that location, he timed a route to Southland Parkway, which took seven minutes and 37 seconds. Tr. 376–77. Finally, Adkins timed a route from the alley near the 300 block of Fahey Street, down Fahey Street, to Silver to South Prospect Street, all the way to Barks Road and then over into Southland Parkway, which took approximately seven minutes and six seconds. Re. 379.

{¶ 19} On cross-examination, Adkins testified that when he tried to open the door with the knob, it did not turn. Tr. 384. Smith then hit the door a couple of feet above the knob, and the door opened. Tr. 384. Adkins testified that he did not recall seeing any damage to the door frame. Tr. 384. Adkins also testified that depending on whether a train was stopped, the times of his routes would need to be adjusted. Tr. 388–89.

{¶ 20} The next witness for the State was Jason Lore ("Lore"). Lore testified that he was the owner of a 2005 silver Chevrolet Equinox. Tr. 392. The vehicle was stolen in January of 2012, while he was on a customer's porch, delivering a pizza. Tr. 393. In February of 2012, the vehicle was recovered and returned to him. Tr. 393. The vehicle had been damaged and was covered in mud. Tr. 396. The day the insurance adjuster was to come, Lore received a call from a detective with the Marion Police Department telling him they needed to look at the vehicle again because it may have been involved in a crime. Tr. 396. On cross-examination, Lore testified that he did not see who took his car. Tr. 399.

{¶ 21} For its sixth witness, the State presented the testimony of Patrolman Shane Gabriel ("Gabriel") of the Marion City Police Department. Tr. 400. Gabriel testified that he and Adkins were the first two officers to respond to the shooting call. Tr. 401. He recognized Smith and Sue Mount ("Mount") when he arrived. Tr. 401. Smith and Mount were "frantically screaming for us to help". Tr. 401. Once he and Adkins stepped into the home and saw the body, he went back outside to speak with Smith and Mount. Tr. 401–402. After the crime scene had been established, Cook appeared drinking a McDonalds' milkshake and asked what was happening. Tr. 404. Cook arrived on the scene approximately 20 minutes after Gabriel. Tr. 404. Eventually Gabriel was ordered to place Cook in his cruiser. Tr. 405. Gabriel was later instructed to take Cook into custody, so he placed Cook in handcuffs and searched him. Tr. 405. Cook was carrying a Samsung phone, some money, cigarettes, and a chapstick. Tr. 405. Gabriel testified that he had informed Cook that Aldrich had been shot in the head and that she was deceased. Tr. 409. Cook expressed a "mild amount of emotion" at the news. Tr. 409.

{¶ 22} Lieutenant Jon Shaffer ("Shaffer") of the Marion City Police Department testified next for the State. Shaffer testified that he was third officer on the scene of the shooting. Tr. 411. After taping off the scene, Shaffer kept a log of people entering and exiting the home where the victim was shot. Tr. 411–12. When Shaffer left the scene, he went to the McDonalds where Cook had purchased his milkshake and to the Speedway where Cook had purchased his cigarettes to retrieve video evidence. Tr. 412–13. The McDonalds had no video, but Shaffer was able to ascertain that the register time was within one minute of his cell phone time. Tr. 414. The Speedway did have a video and he was able to view Cook entering the front door of the gas station at 5:12 p.m. on their video. Tr. 415–16. The video showed Cook leaving at 5:14 and texting on his cell phone. Tr. 416–17. Shaffer then drove the route from Speedway to the home on Bartram to McDonalds and learned that the route, with light to no traffic, took 8 minutes and 29 seconds. Tr. 419–20.

{¶ 23} On cross-examination, Shaffer testified that during his timing of the route, he was stopped at every light. Tr. 422. He admitted that it would be possible to not get stopped at the lights. Tr. 422. If one did not get stopped by the lights, the trip could be two to four minutes shorter. Tr. 422.

{¶ 24} The eighth witness for the State was Detective Brian Liston ("Liston") of the Marion Police Department. Tr. 425–26. Liston testified that he arrived at the scene around 6:08 p.m. on the day of the shooting. Tr. 426. His task at the scene was to make all the measurements at the scene. Tr. 427. The chair where Aldrich was sitting was located seven feet and six inches from the front door. Tr. 431. The refrigerator was located approximately five to six feet from the rear of the chair. Tr. 432. Liston testified that there were three rounds fired, with two of them striking Aldrich and one entering the refrigerator. Tr. 436.

{¶ 25} Liston also testified that he attended the autopsy on Aldrich. Tr. 439. As a result of the autopsy, Liston recovered photographs and bullet fragments from inside Aldrich's skull. Tr. 441. At the autopsy, Liston took photographs and identified three of them during trial. Tr. 445. Exhibit 9B4 was identified as the assistant coroner showing the path one of the bullets took that grazed Aldrich's neck and caused a hole in her ear. Tr. 446. Exhibit 9B5 was identified as a photograph of the x-ray of Aldrich's skull prior to the autopsy. Tr. 447. Liston identified 9B6 was also a picture of the x-ray showing the bullet that entered the skull. Tr. 447–48.

{¶ 26} Officer Norm Ratterman ("Ratterman") of the Marion City Police Department testified for the State as well. Tr. 459–60. Ratterman testified that he responded to the call about a vehicle parked illegally on Leader Street. Tr. 460. The vehicle was a silver Chevy Equinox. Tr. 461–62. Ratterman then ran a check on the license plate and learned that it had been stolen. Tr. 462. The car was then towed from the scene. Tr. 466. After being towed, it was taken to the police department and processed. Tr. 467.

{¶ 27} The eleventh witness for the State was Special Agent Richard Warner ("Warner") of the Ohio Bureau of Criminal Identification and Investigation ("BCII"). Tr. 469. Warner testified that his duties at BCII "are to investigate computer facilitated crimes or anything involving electronic media, whether it's digital video recording systems, cellular phones, computers, digital camera." Tr. 470. The Marion Police Department asked BCII to assist in the analysis of a cell phone. Tr. 472. The phone he received to analyze was a Samsung phone, which was identified as belonging to Cook. Tr. 472, 479. Warner identified State's Exhibit 5 as the report he generated after examining the phone. Tr. 476. When Warner first examined the phone, he could not access the information because it had a pattern lock. Tr. 477. Once they obtained a password to bypass the lock, Warner was able to access the contents of the phone. Tr. 478–79. Warner testified that he was able to retrieve the contacts, the call history, and the text messages from the phone. Tr. 481. This information was recorded onto a CD, which was identified as State's Exhibit 5B3. Tr. 481.

{¶ 28} The State's twelfth witness was Smith. Smith testified that she and her children lived at the home where the shooting occurred. Tr. 488. Smith testified that Aldrich was her cousin and the mother of Kyra, who was fathered by Cook. Tr. 489. Aldrich came to Smith's home on February 7, 2012, for a cousin's birthday and because Aldrich had a child support court hearing scheduled for 10:00 a.m. on February 8, 2012. Tr. 490. Smith testified that Aldrich went to the hearing and returned to the home at around 11:00 a.m. Tr. 491. After Aldrich arrived, she began texting with Cook and was reading the texts to Smith as they arrived on her phone. Tr. 492. Smith testified that at some point during the texting, Cook was at his sister's house next door. Tr. 497. The context of the texting was that they were arguing about the child support hearing. Tr. 497. Aldrich told Smith that she had asked Cook to give her a ride home and Aldrich gathered her things, placed them in a bag, and put the bag beside the chair where she was sitting. Tr. 498. Eventually, Gullett left to go to the convenience store for Aldrich and Smith left to go to the store with her mother, and her other children. Tr. 500. Smith testified that she left the house around 5:00 p.m., but Aldrich stayed at the house. Tr. 501.

{¶ 29} When Smith returned to the house, she went in with the bags and followed her children into the home. Tr. 503. She turned towards the kitchen to put things away and heard her children talking to Aldrich. Tr. 504. The children thought Aldrich was playing a trick and told Smith that Aldrich "had Tabasco sauce sticking out of her head with tissue. Tr. 504. Smith then went into the room and saw blood everywhere. Tr. 504–505. At that time Smith started screaming and ran outside calling to her mother. Tr. 505. Smith's mother then came into the house and came out telling Smith to call the police. Tr. 505. Smith then called the police and told them that Aldrich was dead and there was blood everywhere. Tr. 506. The recording of the call indicated that Smith believed that Cook was responsible for Aldrich's death. Tr. 507.

7

{¶ 30} After Gullett was interviewed by the police, Smith drove him around to see if he could identify a vehicle that matched the one he saw. Tr. 508. When Gullett saw a similar vehicle, Smith stopped her car, took pictures of the other vehicle, and texted them to the police. Tr. 509. The vehicle was a Chevrolet Equinox. Tr. 509. When Smith returned from the police station to her home, she observed a hole in her refrigerator. Tr. 510. When she left to go to the store, the refrigerator did not have a hole in it. Tr. 510.

{¶ 31} Smith testified that the day before the shooting, Aldrich was texting her about coming to Smith's home. Tr. 512. One of the texts stated that Aldrich could not come until after dark because Cook was "talking shit." Tr. 513. The next text from Aldrich stated that Cook was trying to determine if Aldrich was bringing their daughter and that Aldrich believed Cook was "plotting something." Tr. 513. Aldrich also texted that she did not know what to expect from Cook. Tr. 514.

{¶ 32} On cross-examination Smith testified that she had known Cook for years. Tr. 514–15. Smith testified that prior to the shooting, she had always gotten along with Joey and Lisa. Tr. 515. Smith admitted that she had not expected that Cook would do anything as drastic as killing Aldrich. Tr. 517. Aldrich had told her that Cook was going to take her home and Smith was concerned it was not a good idea because they had been arguing earlier in the day. Tr. 518. The plan was for Cook to take Aldrich to dinner, to take her home, and then he would bring their daughter back with him for a couple of weeks. Tr. 519. When Smith arrived home and saw Aldrich she suspected Cook because he was expected at the house. Tr. 521.

{¶ 33} For its thirteenth witness, the State presented the testimony of Angela Kloha ("Kloha"). At the time of the shooting, Kloha was an assistant prosecutor working in the area of child support enforcement. Tr. 522. Kloha testified that she set the child support for Aldrich and Cook approximately one year prior to the shooting. Tr. 523. Aldrich was the obligee and Cook was the obligor. Tr. 523. When child support was established, Cook was very angry that he was being ordered to pay child support. Tr. 524–25. From the time support was established in November of 2010, until the time of the shooting, Cook had not made a single payment. Tr. 525. The hearing was to determine if Cook was in contempt of court. Tr. 525. In order to get out of the hearing, Cook made a payment of $100 to get the hearing continued. Tr. 525–26. Cook's payment did result in the hearing getting postponed, but Kloha was unable to reach Aldrich because they did not have a valid phone number for her. Tr. 527. On the morning of February 8, 2012, Aldrich appeared for the hearing, but Cook did not. Tr. 528. Aldrich was upset that the hearing was continued and indicated that Cook was making the payment merely to avoid having to pay any additional money. Tr. 528–29. Kloha then testified that she told Aldrich that Kloha would dismiss the contempt motion and would file a criminal nonsupport complaint so that Aldrich would not have to come to additional hearings. Tr. 529.

8

{¶ 34} Later that same day, Kloha received a phone call from Aldrich, who indicated that Cook was in contact with her and was sitting outside of the house where she was staying. Tr. 531. Kloha testified that Aldrich just wanted to confirm that she would not need to come back for further hearings if Cook did not pay his child support. Tr. 531. On cross-examination, Kloha testified that in her opinion, Cook had been "working the system" in order to get out of paying his support, which was why she decided to follow up any further nonpayment of support with a criminal complaint instead of a motion for contempt. Tr. 533–34.

{¶ 35} Officer Andrew Burdick ("Burdick") from the Marion City Police Department was the fourteenth witness to testify for the State. Tr. 536. When Burdick arrived at the scene, he began canvassing the neighbors for potential witnesses. Tr. 538. The next day, he processed a recovered stolen vehicle that had been towed to the police station. Tr. 538. Burdick testified that he was "responsible for processing the vehicle for any type of physical evidence such as DNA or fingerprints." Tr. 538. Burdick obtained one fingerprint from the rear view mirror and a cigarette butt from the floor of the passenger seat. Tr. 539. These items were submitted to BCII for analysis. Tr. 541.

{¶ 36} Dr. Kenneth Gerston ("Gerston") testified that he is a deputy coroner at the Franklin County Coroner's Office. Tr. 570. Gerston testified that he was the doctor who performed the autopsy on Aldrich. Tr. 573. The autopsy report was identified as Exhibit 9A. Tr. 574. Gerston's autopsy revealed that Aldrich suffered two gunshot wounds. Tr. 574. The first was to the left ear and the second was to the forehead on the right side of her head. Tr. 574. Given the stippling of the gunpowder and how it was spread out over a wide area, the muzzle was within a few feet of the victim when the gun was shot. Tr. 578. The injuries indicated that the bullet traveled relatively level front to back into Aldrich's skull. Tr. 580. The cause of death was a gunshot wound to the head. Tr. 586.

{¶ 37} The sixteenth witness for the State was Tom Eisenloffel ("Eisenloffel"), who is a principal assistant performance engineer with Verizon Wireless. Tr. 589. Eisenloffel testified that the phone number ending in 0777 was activated as a prepaid phone. Tr. 597. The same number was registered as belonging to Bertuzzi. Tr. 597. At 5:21 p.m., on February 8, 2012, Bertuzzi received a text message indicating that he had eight voice mails. Tr. 631. On cross-examination, Eisenloffel testified that it is not possible to determine the exact position of a cell phone from call records. Tr. 632.

{¶ 38} The next witness for the State was Detective Ben Graff ("Graff") of the Marion City Police Department. Tr. 638–39. Graff testified that he arrived on the scene of the shooting between 5:30 p.m. and 6:00 p.m. Tr. 639. Graff's assignment at the scene was to collect evidence. Tr. 639. The detectives took between three and four hours to process the scene. Tr. 640. When Graff arrived, Aldrich's body was still present, and he found a cell phone on her lap. Tr. 640. The phone was still turned on. Tr. 640. Graff obtained Cook's phone as well, but had to send it to BCII

for review as it was password protected. Tr. 642. Cook's phone listed Aldrich's contact numbers as 7XX–XXX–1556 and 5XX–XXX–0170. Tr. 645. Bertuzzi's number was identified as 7XX–XXX–0777. Tr. 645. Jerry "JJ" Miller ("Miller"), Cook's nephew, was linked to phone number 7XX–XXX7091. Tr. 645. Phone number 7XX–XXX–4595 was identified as belonging to "my wifey", who was later identified as Cook's then girlfriend, Whitney Williams ("Williams"). Tr. 645–46. Graff had submitted a search warrant for the cell phone records for the numbers belonging to Williams, Bertuzzi, Michelle Hall ("Hall"), and Amanda Wooten ("Wooten"). Tr. 651. Exhibit 18J1 was identified as the text conversations between Miller's phone and Bertuzzi. Tr. 660.

{¶ 39} The State then interrupted Graff's testimony to present the testimony of Williams. Tr. 686. Williams testified that she had dated Cook for ten months and that he was the father of her child. Tr. 687. On the date of the shooting, Williams was living with Cook at his residence on Plymouth Street. Tr. 687. Williams testified that she knew of Aldrich, but had not personally met her. Tr. 688. According to Williams, the relationship between Aldrich and Cook was not good. Tr. 689. A week or two before the shooting, Bertuzzi had come to the house to speak with Cook. Tr. 689–90. Williams identified her cell phone as having the phone number 7XX–XXX–4595. Tr. 690. Williams testified that she had never called Bertuzzi or sent him any text messages from her phone. Tr. 691. On February 8, 2012, her phone was in the house and Cook had access to it. Tr. 691. Cook frequently used her phone rather than his own because she had a better signal. Tr. 691. Williams testified that she did not send a text message to anyone at 7:47 a.m. on February 8, 2012. Tr. 693. Williams also testified that she did not receive the messages on that day that were sent to her phone in response to the message sent. Tr. 694–95. According to Williams, Cook is the only person who would have had access to her phone at the time the text conversation was occurring. Tr. 695–96. Later that day, she learned Aldrich had been killed and she had to pick Cook up from jail. Tr. 697–98.

{¶ 40} On cross-examination, Williams testified that Cook was left-handed. Tr. 707. Williams also testified that Cook owned a black gun. Tr. 707. Williams admitted that Cook was conducting drug transactions using her phone on a frequent basis. Tr. 708.

{¶ 41} Miller was the next witness for the State. Tr. 709. On February 8, 2012, Miller lived with his parents and his sister at 623 Bartram in Marion Ohio. Tr. 710. Smith lived next door. Tr. 711. Miller testified that he knew Aldrich through her relationship with Cook, who is his uncle. Tr. 711. Earlier on the day of the shooting, Cook was at his house. Tr. 712. Miller testified that Cook had asked to use his cell phone. Tr. 712. Cook then used the phone to text somebody, but deleted the message from the phone after it was sent. Tr. 713. Miller identified his phone number as 7XX–XXX–7091. Tr. 714. Miller testified that he knew who Bertuzzi was, but had not sent a text message to Bertuzzi on February 8, 2012. Tr. 714. Around 4:00 or 5:00, Lisa, who is Miller's mother, sent him to his room. Tr. 715–

16. At some point in time he heard gunshots. Tr. 716. Miller then ran into his sister's bedroom and looked out the window. Tr. 716. Miller then saw somebody in a gray truck leaving the scene. Tr. 717. Miller testified that he had seen the vehicle at his house before when "[s]ome Mexican brought it over trying to sell it." Tr. 717. Miller's father, Joey, bought the vehicle. Tr. 718. After the shooting, Miller saw a person wearing a black hoody get into the vehicle and leave. Tr. 719–20.

{¶ 42} On cross-examination, Miller testified that he had no idea why his mother sent him to his room. Tr. 722. Soon after being sent to his room, Miller heard the gunshots. Tr. 722. Cook was not at the house when Miller was sent to his room. Tr. 722. Miller admitted that Cook wears a black hoody. Tr. 723. Miller also testified that Lisa had driven the vehicle at one point in time. Tr. 723. After seeing the vehicle out of his sister's window, Miller went into the living room where he saw Joey and Lisa. Tr. 726.

{¶ 43} After Miller finished testifying, Graff returned to the stand. Tr. 729. Graff then presented the content of text messages between Cook and Aldrich, which were found on Cook's phone. Tr. 731. On December 30, 2011, Aldrich texted Cook that she would need a child support payment or there would be no visitation. Tr. 731. Cook responded that he was not going to pay and told Aldrich to sell some of the items she had taken from him. Tr. 732. Over the next month, the two continued to argue about Cook's failure to provide child support and Aldrich's failure to provide visitation to Cook. Tr. 733–38.

{¶ 44} On the morning of February 8, 2012, Aldrich and Cook continued to argue via text message. Cook was angry that Aldrich had not brought his daughter for him to see and Aldrich was angry that Cook was not paying the child support. 738–740. Aldrich informed Cook that an arrest warrant had been issued for him. Tr. 738. Graff testified that Cook had called the Sheriff's department to check on the warrant issue. Tr. 739–40. At 3:52 p.m. Aldrich texted Cook that she had won because he would be making the payments weekly. Tr. 740. Aldrich then texted Cook that they needed to talk. Tr. 740–41. Cook responded that he would take Aldrich home, they would have dinner, and he would pick up their daughter for a visit. Tr. 741. At 5:14 p.m., Aldrich texted Cook asking him when they would be leaving. Tr. 741. Cook responded that he would be there soon. Tr. 741. At 5:38 p.m., Cook texted Aldrich that he was on his way. Tr. 741. In addition to the text messages, Graff testified that the phone records revealed there had been phone calls in addition to the text messages. Tr. 741–42.

{¶ 45} Graff also testified to the content of the text messages from Williams' phone to Bertuzzi's phone on February 8, 2012, at 7:46 a.m. The message stated that the court hearing had been rescheduled. Tr. 742–43. The reply came approximately 20 seconds later and asked when the new hearing would be. Tr. 744. An answer was sent at 7:48 a.m. and stated that the date and time were unknown. Tr. 744.

11

{¶ 46} At 3:48 p.m., a message was sent from Miller's phone to Bertuzzi's phone. Tr. 745. The message sent was "Hey, bro, it's B. Can you go to my mom now." Tr. 745. The reply was "yeah." Tr. 745. Then a second reply came in asking who had sent the first message. Tr. 745. The answer from Miller's phone was "Bo". Tr. 745.

{¶ 47} On cross-examination, Graff testified that drug dealers use coded text messages, so the text messages may not mean what they appear to say. Tr. 747–48. Graff admitted that saying "meet me at my mom's" was not inconsistent with drug trafficking. Tr. 749. Graff also testified that when he executed the search warrant on Cook's home, he found three black hoodies. Tr. 750. Graff also recalled that Cook may have been wearing a black hoody when he was arrested on February 15, 2012. Tr. 751.

{¶ 48} The twentieth witness for the State was Gary Slater ("Slater"). Slater testified that he maintains the computerized security system at the Graphic Packaging plant. Tr. 755–56. Slater testified that one of the cameras looks out onto Plymouth Street. Tr. 756. Slater testified that he downloaded video images for the police for the time between January 28 and February 8, 2012. Tr. 759.

{¶ 49} Jeff Fitzpatrick ("Fitzpatrick") testified next. Fitzpatrick testified that he had dated Cook's mother and that he was Aldrich's uncle. Tr. 764–65. At approximately 11:00 a.m., Fitzpatrick saw Cook when he went to wake Cook for the court hearing. Tr. 766. The next time Fitzpatrick saw Cook was at about 4:00 p.m. when Cook came to the house where Fitzpatrick was living. Tr. 767. Cook told Fitzpatrick that Cook would be taking Aldrich home and bringing their daughter back for a visit. Tr. 769. After approximately fifteen minutes, Cook left, but returned five to ten minutes afterward. Tr. 770–71. At that time, Fitzpatrick observed Cook speaking on the phone while Bertuzzi was sitting on the couch. Tr. 772. Bertuzzi was wiping off a small black revolver. Tr. 772. Fitzpatrick later heard someone leave and then Cook came back to ask if Fitzpatrick was ready to go to dinner. Tr. 773–74. When they left, Fitzpatrick saw a small SUV in the alley with Bertuzzi sitting inside of it. Tr. 777. Fitzpatrick testified that he had seen the vehicle previously when Lisa was driving it. Tr. 778. After that instance, Fitzpatrick had seen the vehicle in Cook's driveway a few days before the shooting. Tr. 779. Fitzpatrick observed the SUV turn down the intersecting road and turn behind the drive-thru. Tr. 783. That was the last time Fitzpatrick saw the vehicle because Cook went a different way. Tr. 784. Cook then took Fitzpatrick to Speedway and then on to McDonalds. Tr. 785. Fitzpatrick testified that Cook was driving excessively fast, but was unconcerned about getting a ticket. Tr. 785–86. According to Fitzpatrick, Cook had previously threatened to kill Aldrich. Tr. 788.

{¶ 50} Lisa was the next witness for the State. Tr. 812. Lisa testified that Cook and Aldrich had a rocky relationship and were in the midst of a custody battle and a battle over child support as of February 8, 2012. Tr. 814. On multiple occasions, Lisa had heard Cook threaten to kill Aldrich. Tr. 814. The day before the shooting Cook told Lisa that Aldrich was enlisting in the army and was taking their child out

of state. Tr. 815. Cook stated that he was not going to let that happen and that Bertuzzi was a good and loyal friend. Tr. 815. On February 8, 2012, Cook came to her house in the afternoon. Tr. 816. Before Lisa left to run errands, Cook told her to make sure she had an alibi and to be seen "on camera wherever you go." Tr. 816. After returning from errands, Lisa's daughter went out to play and ran into Aldrich. Tr. 820. Her daughter told her that Aldrich said Cook would be bringing their daughter home and the two girls would get to play. Tr. 821. Lisa then called Cook to ask him about it. Tr. 821. Lisa testified that she told Cook that Aldrich was next door and what she had said. Tr. 821–22. Cook's response was "get her out, get her out now," and hung up the phone." Tr. 822. Lisa then went and brought her daughter into the house. Tr. 822.

{¶ 51} Soon afterward, Lisa saw the silver SUV pull up in front of Smith's home. Tr. 822. Lisa testified that the SUV pulled up, sat there for a few minutes and then a man wearing a black hoody covering his head and face got out. Tr. 823. Lisa testified the person was wearing white tennis shoes and jeans as well. Tr. 823. When she observed him going towards Smith's house, she told her kids to go to their rooms. Tr. 823. She then heard three shots. Tr. 824. Based upon the way the person walked, his height, and his build, she recognized the person as Bertuzzi. Tr. 326. A few days later, Cook and Bertuzzi came to Lisa's home. Tr. 832. Cook stated that the SUV had been left on Silver Street and that Bertuzzi would do anything for him. Tr. 833. Cook also stated that if Aldrich's mother tried to keep his daughter away from him, "something like that might happen to her too." Tr. 833. Lisa also testified that she did not tell the police what she knew because she was concerned for the safety of her family. Tr. 834.

{¶ 52} Lisa testified that a person had brought the SUV to her house trying to sell it approximately a week before the shooting. Tr. 836. Joey bought the vehicle using heroin to pay for it. Tr. 836. Lisa testified that she drove it three times and then they sold it to Cook. Tr. 837.

{¶ 53} On cross-examination, Lisa testified that she could not identify the shoes the shooter had been wearing. Tr. 849. She also testified that Cook wore hoodies all the time. Tr. 850. Lisa testified that she did not want to help the police because she was afraid of what Cook would do if he found out. Tr. 851. Lisa admitted that Cook would be willing to kill his own sister to avoid prison. Tr. 851. She also admitted that Bertuzzi was of average height and weight, so the description could match many people. Tr. 851–52.

{¶ 54} Joey testified that Cook had come to his home on February 8, 2012, and that he and Lisa had eventually left to run errands. Tr. 857–58. Before they left the home, Cook told them to make sure they were caught on camera. Tr. 858. They later returned home and Cook had left. Tr. 859. Joey testified that Lisa had spoken with Cook and later he heard a car pull up near the house. Tr. 860. Within a couple of minutes, the driver of the vehicle got out and approached Smith's house. Tr. 861. A few seconds later, Joey heard two quick gunshots followed by a third gunshot.

13

Tr. 861. Joey testified that he then saw a person run to the SUV, get in, and take off at a high rate of speed. Tr. 862. Joey described the person as being similar in build to Joey, wearing a pair of "white Jordans with a black tongue and black shoe strings with a red stripe." Tr. 862. When the shooter left, Joey took his children to his mother's home, and then returned to his home. Tr. 863.

{¶ 55} A couple days after the shooting, Cook and Bertuzzi came to Joey's home. Tr. 865–66. Bertuzzi said that "he walked up to the house, kicked open the door, and she was sitting in a chair and stood up and he shot her". Tr. 866. Cook stated that they had abandoned the car by Fagan Commercial. Tr. 867. Joey understood that the murder was committed over the child support and custody battle. Tr. 867. Joey testified that he initially lied to the police because he was scared that Cook and Bertuzzi would kill him or his children. Tr. 868–69. Joey admitted that he had initially bought the SUV in exchange for two bags of heroin. Tr. 870. Joey then tried to return it because there was no title, but Cook offered to buy it for a half a gram of heroin. Tr. 870–71. For safety purposes, Cook offered to give Joey a gun, but when Joey asked for a .38 revolver, Cook told him it was no longer around. Tr. 871.

{¶ 56} On cross-examination, Joey testified that Cook's build is very similar to his own. Tr. 883. Joey also admitted that he had not volunteered to help the police. Tr. 877. Although Joey knew someone had been injured or killed, he did not call the police. Tr. 885.

{¶ 57} The twenty-fourth witness for the State was Hall, who was dating Bertuzzi at the time of the shooting. Tr. 886–888. On February 8, 2012, Bertuzzi was driving Hall's vehicle. Tr. 893–94. Bertuzzi drove Hall to work around 2:00 and picked her up at 10:00 p .m. that same day. Tr. 894. At 4:55 p.m. on February 8, Bertuzzi texted Hall and told her he was turning off his phone and would call in about 30 minutes. Tr. 896–97. Hall testified that she was at work that entire afternoon and evening and did not drive her car to Plymouth Street. Tr. 898. Finally, Hall testified that Bertuzzi was not employed, but made money by dealing heroin. Tr. 899.

{¶ 58} On cross-examination, Hall testified that Bertuzzi picked her up after work and they went back to her apartment. Tr. 900. At the apartment, Bertuzzi was acting normal. Tr. 900. Hall denied knowing that Bertuzzi dealt drugs when she started dating him and testified that she saw him every day while they were dating. Tr. 901. Hall also testified that Bertuzzi was right handed. Tr. 901. On re-direct, Hall testified that the night that Bertuzzi was arrested, February 15, 2012, he was acting "really antsy." Tr. 902.

{¶ 59} The next witness for the State was Patrolman Andrew Isom ("Isom") of the Marion City Police Department. Tr. 904–905. Isom testified that he went to Graphic Packaging to obtain some surveillance video the company had. Tr. 906. In the video he reviewed, Isom saw the stolen, silver Chevy Equinox on Plymouth Street several times. Tr. 908. The first time it was spotted was February 5, 2012. Tr. 910. The

next day, there is video footage of the Chevy Equinox and Cook's vehicle pulling into the drive at Cook's home. Tr. 912–14. On February 7, 2012, the video footage showed the stolen vehicle parked on the street with someone wearing a gray hooded sweatshirt exiting the vehicle. Tr. 914.

{¶ 60} Isom testified that he had also seen Hall's car on the video footage outside of Cook's home as well. Tr. 915. The video footage showed that Hall's car was on Plymouth Street on February 8, 2012, at approximately 10:26 a.m. Tr. 916. Hall's car pulled into the drive at Cook's home. Tr. 917. Later that same day, the car was back at approximately 3:55 p.m. Tr. 917. Both Hall's car and Cook's car were taped leaving at around 4:23 p.m. on February 8, 2012. Tr. 921. The Chevy Equinox was viewed leaving Plymouth Street at approximately 4:40 p.m. Tr. 921. Cook's vehicle then returned and left again around 5:09 p.m. Tr. 922–24. The vehicle returns to the home again around 5:38 p.m. Tr. 924.

{¶ 61} On cross-examination, Isom testified that it was not uncommon for drug dealers to use stolen vehicles or vehicles belonging to a third party to complete drug deals. Tr. 932. Isom also testified that an unknown person wearing a dark hoody was seen walking towards Plymouth Street, although the stolen Chevy Equinox had already left the scene. Tr. 932. Isom testified that a person could change from a gray hoody to the black hoody in a very short time. Tr. 933. On redirect, Isom testified that he did not know where the Equinox went, only that it was out of view of the camera. Tr. 933.

{¶ 62} Gina Rawlins ("Rawlins") was the next witness for the State. Tr. 935. Rawlins testified that she was a drug addict and was on probation for possession of heroin. Tr. 936–37. Rawlins testified that she knew Bertuzzi because he was her dealer. Tr. 937. Rawlins admitted to using heroin once or twice a day. Tr. 940. As of February 8, 2012, Rawlins owed Bertuzzi $900 for heroin. Tr. 942. She contacted him at 4:50 and asked to meet Bertuzzi to give him some money and to get more heroin. Tr. 942–944. Bertuzzi texted Rawlins that he would meet her in about a half hour. Tr. 943–44. Rawlins testified that she eventually met Bertuzzi outside of Hall's apartment at approximately 5:25 p.m. Tr. 945. According to Rawlins, it was unusual for Bertuzzi to make her wait when she was offering to pay him what she owed. Tr. 947. On cross-examination, Rawlins testified that the transaction was normal and that she did not recall having to wait for Bertuzzi once she arrived at the apartment. Tr. 949–50.

{¶ 63} Detective David Troutman ("Troutman") testified that on February 8, 2012, he was a detective for the Marion City Police Department. Tr. 959. On the day of the shooting, Troutman responded to the scene and took pictures of the crime scene. Tr. 959–60. Troutman testified that he also collected a bullet from inside a refrigerator at the scene. Tr. 960–61. The bullet had gone from the rear side panel of the refrigerator towards the front and appeared to be on a level trajectory. Tr. 963. It lodged in the middle divider of the side-by-side refrigerator. Tr. 964. The

bullet would have traveled in the general direction of anyone standing in front of it. Tr. 965.

{¶ 64} On February 9, 2012, Troutman went to Speedway and to McDonald's to obtain video from the stores. Tr. 970. From the Speedway video, Troutman was able to see Cook drive his vehicle to the Speedway, enter the store, and then leave the parking lot later. Tr. 971. Cook first arrived in his vehicle at 5:13 p.m. Tr. 975. The video showed Cook exiting the vehicle and entering the store at 5:13 .48. Tr. 977. Cook is then seen making a purchase in the store. Tr. 978. On that video, Cook is seen wearing a gray hoody sweatshirt. Tr. 978. Cook then left the store at around 5:15 p.m. His vehicle leaves the parking lot at around 5:16 p.m. Tr. 979.

{¶ 65} The video from McDonald's confirmed for Troutman that Cook and Fitzpatrick had come into the restaurant and later left it. Tr. 971. The video showed that Cook and Fitzpatrick arrived at the restaurant at 5:21 p.m. Tr. 988. Cook reappears on the video at 5:22 p.m. holding a cup. Tr. 988–89.

{¶ 66} On February 10, 2012, Troutman interviewed Joey. Tr. 992. During that interview, Joey stated that he was at his mother's home when the shooting occurred. Tr. 993. Troutman interviewed Joey a second time on February 15, 2012. Tr. 994. Before the second interview, Troutman had received some information linking Joey to the stolen Chevy Equinox. Tr. 994. Joey was initially reluctant to talk, but eventually asked for protection before he would talk. Tr. 995. The police offered to put Joey someplace safe and he agreed to give them more information. Tr. 995–96. The interview with Joey lasted for an hour and a half to two hours. Tr. 996.

{¶ 67} After the interview with Joey, the police were looking to arrest Cook and Bertuzzi. Tr. 997. Troutman eventually found Bertuzzi and attempted to arrest him. Tr. 1001. When the police tried to stop Bertuzzi's vehicle, he and another person got out of the vehicle and started running. Tr. 1001. Bertuzzi was apprehended by the canine dog half a block away. Tr. 1002. Bertuzzi immediately stated that he did not wish to speak with them, so he was placed in the patrol car. Tr. 1003. Troutman testified that he confiscated the shoes of Bertuzzi when he was arrested. Tr. 1036. The shoes matched the description of the shoes described by Joey as being worn by the shooter. Tr. 1036–37.

{¶ 68} On cross-examination, Troutman testified that Joey had originally told the police that he was not home when the shooting occurred. Tr. 1043. Lisa had originally told the police that she had been in her bedroom and only came out when she heard the sirens. Tr. 1043. A couple of days later, they were both interviewed again and repeated the statement that they did not know anything more. Tr. 1044. Troutman also testified that it is not uncommon for people with police records to run when the police are trying to arrest them. Tr. 1050.

{¶ 69} The next witness for the State was Patrolman Jamie Ralston ("Ralston") of the Marion City Police Department. Tr. 1060. Ralston testified that on February 15,

2012, he was dispatched to the scene of a suspicious vehicle. Tr. 1061. After a while, two individuals approached the truck, entered it, and started to leave. Tr. 1063. Ralston testified that he began to institute a traffic stop when the truck made an abrupt stop. Tr. 1064. At that time, both the driver and the passenger exited the truck and began to flee on foot. Tr. 1064. The truck had been placed in reverse and rolled into Ralston's cruiser. Tr. 1064. Creps, who was also on the scene, released his canine to catch the driver. Tr. 1065. The dog caught the driver, who was later identified as Bertuzzi. Tr. 1065.

{¶ 70} Lieutenant B.J. Gruber ("Gruber") of the Marion City Police Department was the twenty-ninth witness for the State. Tr. 1068. On February 15, 2012, he was called in as part of the special response team to serve arrest warrants for Cook and Bertuzzi and to help search Cook's home and Cook's mother's home. Tr. 1070. When they arrived at Cook's mother's home, they knocked and announced their presence. Tr. 1072. Gruber testified that he heard movement in the home, so the decision was made to breach the door. Tr. 1072. The door had been barricaded, but they were able to see Cook inside the home. Tr. 1072. Before they were able to enter the home, Cook came out another door with his hands raised and was taken into custody without further incident. Tr. 1072–73. Gruber then assisted with the search of the home. Tr. 1073. Inside they found three firearms: 1) a police style revolver; 2) a semi-automatic pistol; and 3) an assault rifle. Tr. 1073–74.

{¶ 71} Detective Dan Ice ("Ice") of the Marion Police Department testified next for the State. Tr. 1076. Ice testified that on the day of the shooting, he interviewed Smith at the scene. Tr. 1076. Smith pointed out that Cook was at the scene and that his vehicle was parked around the corner. Tr. 1077. Ice then took Smith and Gullett to the station to interview them further. Tr. 1078. Gullett told Ice that he was in the home when the shooting occurred and that there was one assailant. Tr. 1078. Gullett identified the clothing of the shooter as a dark hooded sweatshirt with the hood pulled up and light blue jeans.[4] Tr. 1080. Gullett identified the weapon as a black 9–millimeter like the police officers carry. Tr. 1080. Gullett also identified the vehicle the shooter drove away as a silver vehicle that looked like a minivan, but had four car doors. Tr. 1080. Gullett told Ice that when he realized Aldrich had been shot, he rode his bicycle to his grandmother's home. Tr. 1081. Before Gullett left, Ice asked them to contact him if Gullett saw a vehicle that matched the one he had seen. Tr. 1084. Smith later texted him two photos of a vehicle that Gullett identified as being the same make and model as what he saw, just a different color. Tr. 1087. The vehicle was identified as a Chevy Equinox. Tr. 1087.

{¶ 72} Ice also testified that he searched Cook's car looking for a McDonald's receipt. Tr. 1082. Ice found the receipt in the cup holder of the vehicle. Tr. 1082. The receipt showed a date of February 8, 2012 with a time of 5:21 p.m. Tr. 1082.

{¶ 73} On February 10, 2012, Ice interviewed Lisa. Tr. 1084–85. Lisa told Ice that the only thing she heard the day of the shooting was a loud vehicle and soon

afterward, she heard Smith screaming. Tr. 1086. Lisa told Ice that Cook had been at her home earlier in the day. Tr. 1087.

{¶ 74} Ice interviewed Lisa a second time on February 15, 2012. Tr. 1088. At the beginning of the interview, Lisa repeated what she had earlier stated. Tr. 1089. Lisa was then taken to a monitor so that she could hear what Joey was saying. Tr. 1089–90. After that, Lisa began telling a different story. Tr. 1090. Lisa told him what happened before, during, and after the shooting. Tr. 1090. Lisa was very upset and crying while giving Ice the new information. Tr. 1091. Lisa and Joey feared for their safety, so Ice took them to a hotel outside of Marion. Tr. 1092. After that, Ice assisted in the search for Bertuzzi. Tr. 1092–93.

{¶ 75} On cross-examination, Ice testified that he had shown Gullett several photographs of vehicles which may or may not have contained a Chevy Equinox, but Gullett did not identify the vehicle as the one he saw. Tr. 1097. Ice's report indicated that Gullett was shown a picture of a Chevy Equinox, but stated that was not the vehicle when he was interviewed at the station. Tr. 1097–98. Gullett also told Ice that the shooter had not used a revolver. Tr. 1099–1100.

{¶ 76} Creps testified that he had been assigned to a canine unit for four years. Tr. 1102. Creps indicated that he arrived at the scene of the shooting at 5:22 p.m. Tr. 1104. He initially helped secure the scene, but later spoke to Gullett. Tr. 1105. Gullett was very shaken at the time, had tears in his eyes, and his hands were trembling. Tr. 1105. Creps tried to calm him down so that Gullett could answer questions. Tr. 1105. Gullett eventually was able to tell him that the shooter was around five foot seven with a medium built and was wearing a dark colored hoody jacket with the hood pulled up over his head. Tr. 1106.

{¶ 77} On February 15, 2012, Creps assisted with the apprehension of Bertuzzi. Tr. 1106. Ralston's cruiser was behind the truck and Creps' cruiser was behind Ralston's. Tr. 1107. When Ralston activated the lights, the driver of the truck slowed down, then put the truck in reverse, hit Ralston's cruiser, and fled on foot. Tr. 1107–1108. Creps then yelled for him to stop or he would release the canine. Tr. 1108. The driver continued to run, so Creps sent the dog after him. Tr. 1108. The dog had grabbed ahold of the black hoody worn by the driver, who was identified as Bertuzzi. Tr. 1109. Bertuzzi was then placed under arrest. Tr. 1109.

{¶ 78} On cross-examination Creps testified that the week before the shooting, he had been dispatched to 623 Bartram and there was a large, silver SUV parked in the drive. Tr. 1112. The tag on the vehicle was registered to Cook. In the initial interview with Gullett, he identified the escape vehicle as a large silver SUV. Tr. 1114. Gullett also stated that he did not know what kind of shoes the shooter was wearing. Tr. 1116.

{¶ 79} The thirty-second witness for the State was Wooten. Wooten testified that she was a heroin addict when she met Bertuzzi and often purchased heroin from

him. Tr. 1119. Bertuzzi sometimes spoke about Cook and Wooten believed that they were "really close close friends" based upon the way Bertuzzi spoke about Cook. Tr. 1120. The night Bertuzzi was arrested, Bertuzzi notified her that he needed his truck, which he had leant to Wooten, back. Tr. 1120–21. Bertuzzi then came to her house, left her Hall's car, and drove away in the truck. Tr. 1121. While at Wooten's home, Bertuzzi mentioned that he had to leave town. Tr. 1121.

{¶ 80} On cross-examination Wooten testified that Bertuzzi did not say how long he would be out of town. Tr. 1124. From her experience, the dealers of heroin received the drug from sources in bigger cities. Tr. 1125. The day Bertuzzi traded cars with her, his demeanor was normal in that he was not acting nervous or frightened. Tr. 1126. In the daily contact she had with Bertuzzi for the week prior to Bertuzzi's arrest, Wooten never noticed unusual behavior from Bertuzzi. Tr. 1127.

{¶ 81} Adam Gary ("Gary") testified for the State that he had known Bertuzzi for many years. Tr. 1148. He did not know Cook, but understood that Cook was Bertuzzi's best friend. Tr. 1149. On the morning of February 8, 2012, Gary saw Bertuzzi when he borrowed $20 from him. Tr. 1149. Later that day the emergency vehicles went past his house to the scene of the shooting. Tr. 1150. Approximately an hour or so after Gary learned of the shooting, Bertuzzi came to his home. Tr. 1151. Bertuzzi appeared to be a little nervous, but Gary testified that Bertuzzi has a "nervous problem anyway." Tr. 1151. Bertuzzi asked Gary if he had heard about Cook being arrested. Tr. 1151. Bertuzzi asked Gary to look it up on the computer. Tr. 1152. Bertuzzi then went into the bathroom and it sounded to Gary like Bertuzzi was either vomiting or coughing. Tr. 1152. Bertuzzi stated that he wanted to tell Gary something, but could not. Tr. 1153. Eventually, they learned that Cook had been arrested. Tr. 1154. Bertuzzi stayed at Gary's house until Hall picked him up. Tr. 1154. On February 15, 2012, Bertuzzi came to his house and told him that Cook had been arrested for the murder. Tr. 1155. Bertuzzi appeared nervous to Gary because he was stuttering some, which he does when he is nervous. Tr. 1155.

{¶ 82} Todd Wharton ("Wharton") testified that he was a forensic scientist in the firearms and tool marks section at BCII. Tr. 1165. One of his main tasks is called gun prediction, which is when a bullet is found at a scene and he tries to determine the type of weapon that fired it. Tr. 1166. Wharton testified that he examined the bullets and fragments found at the scene in this case. Tr. 1167–68. The bullet removed from the refrigerator showed some damage from hitting the refrigerator. Tr. 1170–71. The bullet was identified of being in the .38 caliber class of bullets, which includes those fired from a 9–millimeter Luger. Tr. 1171. The jacket from one of the other bullets was also from the same class of bullets. Tr. 1176. After examining the full bullet and the jacket from another, Wharton determined that they were fired from the same weapon. Tr. 1178. The two bullets had eight land and eight grooves with a right hand twist. Tr. 1179. These are fairly common characteristics and fit many different models of guns. Tr. 1182. Three guns were submitted for analysis, but all three were excluded as the weapon that fired the

bullets. Tr. 1183–87. Wharton was questioned about a fourth gun that belonged to Cook, but excluded it because the manufacturer of that weapon did not use the rifling found on the bullets for its .38 class weapons. Tr. 1188–89.

{¶ 83} The thirty-eighth witness for the State was Linda Evelyth ("Evelyth") who worked in the DNA biology division of BCII. Tr. 1195. Evelyth testified that in this case she tested a cigarette butt for DNA. Tr. 1196–97. She compared the DNA to samples from Cook, Bertuzzi, Aldrich, Carlos Villeda ("Villeda")[5], and Lore. The cigarette butt was found to contain DNA from Villeda and at least two other unknown people. Tr. 1198. Evelyth also tested a rag, which contained DNA from Villeda, Lore, and at least one unknown person. Tr. 199. Other samples were submitted from the steering wheel and the gearshift of the Chevy Equinox, however, there was insufficient data for a comparison. Tr. 1200. None of the samples matched either Cook or Bertuzzi.

{¶ 84} The next witness for the State was Martin Lewis ("Lewis") who was a forensic scientist in the trace evidence unit at BCII. Tr. 1205. Lewis testified that gunshot residue will remain on a person or an item for four to six hours with regular activity, but this time can be shortened with washing or being more active. Tr. 1207. The timeframe can be lengthened with less activity. Tr. 1207. Any item near a weapon when it is discharged may have residue on it, including clothing. Tr. 1208. One can also get residue on them by picking up a gun that has been recently fired or touching an item with residue on it. Tr. 1208.

{¶ 85} On February 10, 2012, gunshot residue kits were submitted taken from the steering wheel of a 2004 Yukon, the hands of Cook, and the hands of Gullett. Tr. 1209. Particles "highly indicative of gunshot primer residue were identified on one of the samples from the steering wheel." Tr. 1210. There were no indications of gunshot residue on the swabs of the hands of either Cook or Gullett. Tr. 1210.

{¶ 86} Later, Lewis tested swabs from various articles of clothing. Tr. 1211. Clothing that was submitted from Cook included a gray sweatshirt, a gray pair of denim pants, a long sleeved black shirt and a white tank top. Tr. 1212. The items submitted from Bertuzzi included a pair of tennis shoes, a pair of jeans, and a zip-up sweatshirt. Tr. 1212. The testing on Cook's sweatshirt cuff found "particles highly indicative of gunshot primer" on the left cuff. Tr. 1214. Likewise, Cook's jeans tested positive for gunshot residue. Tr. 1215. No tests were run on Cook's shirt or tank top. Tr. 1215–16. Lewis also tested Bertuzzi's black sweatshirt contained no particles indicative of gunshot residue on it. Tr. 1216. However, Bertuzzi's jeans tested positive for gunshot residue. Tr. 1217. Gunshot residue was also found on Bertuzzi's right tennis shoe. Tr. 1218.

{¶ 87} On cross-examination, Lewis testified that there was no way to determine how long gunshot residue had been on clothing as there are too many variables. Tr. 1224. Lewis also testified that gunshot residue would not stay on leather sneakers for long if they were worn as it would be more likely to be wiped off by activity.

Tr. 1224. The amount of gunshot residue found on the shoes was one particle, which is "a microscopic spec." Tr. 1225–26. Lewis identified Cook's jeans as having six total particles of residue found in the test, and one particle of residue found on Bertuzzi's jeans. Tr. 1228.

{¶ 88} The State then proceeded to read letters written from Cook to Bertuzzi. The first letter indicated that Cook had pled guilty to manslaughter, weapons under disability, tampering with evidence and a gun specification with a total sentence of 20 years. Tr. 1261. Cook indicated in the letter that he would not be turning on Bertuzzi. Tr. 1261. In the second letter Cook said that he was "going to put it on the one who really done the s* *t." Tr. 1261. Cook identified that person as Joey. Tr. 1261. Cook indicated that he would do his best to help Bertuzzi. Tr. 1262.

{¶ 89} The final witness for the State was Major Bill Collins ("Collins") of the Marion Police Department. Tr. 1280. Collins testified that he supervised the investigation into the shooting of Aldrich. Tr. 1281. He arrived on the scene shortly after 5:30 p.m. Tr. 1282. When Collins arrived, Cook was not at the scene. Tr. 1282. Later, he saw Cook in front of the house and Cook's vehicle was parked around the corner. Tr. 1282–83. At around 6:00 p.m., Collins ordered another officer to take Cook into custody. Tr. 1285. Cook was wearing a gray hoodie sweatshirt, gray jeans, and white tennis shoes. Tr. 1285. Cook willingly spoke with Collins at the station. Tr. 1286. Cook told Collins to check the cameras at Speedway and McDonald's and they would see that he could not have shot Aldrich. Tr. 1288. Cook suggested during his interview that the person who was hired to do this may have meant to shoot Smith and mistaken Aldrich for Smith. Tr. 1289. Based upon his interview of Cook, Collins believed that Cook was trying to establish an alibi. Tr. 1290. Cook was then arrested at that time on a drug charge. Tr. 1291.

{¶ 90} Collins interviewed Gullett on February 9, 2012. Tr. 1296. Collins testified that he only printed off two images to show Gullett and both were of a 2005 silver Chevy Equinox. Tr. 1294. During that interview, Gullett stated that he remembered the shooter wearing white tennis shoes that had a little red on them. Tr. 1296–97.

{¶ 91} As of February 14, 2012, Bertuzzi was not a suspect in the investigation. Tr. 1298. The first time Bertuzzi's name was raised was during the interviews of Joey and Lisa. Tr. 1298. Later, while interviewing Williams, her phone kept ringing. Tr. 1303–1304. The phone number calling was identified as belonging to Bertuzzi. Tr. 1305. Williams denied knowing to whom the number belonged. Tr. 1304.

{¶ 92} On cross-examination, Collins testified that when Cook was arrested, his clothes were confiscated and those clothes were sent for testing for gunshot residue. Tr. 1321. There was gunshot residue on the left cuff of the hoody, but not on the right. Tr. 1321. Cook told Collins that he eats and writes with his left hand, but throws a ball and shoots with his right hand. Tr. 1322. During the interview Collins told Cook that the description of the shooter was very similar to Cook and what he was wearing. Tr. 1324. Collins also admitted that although he had Gullett shown

pictures of a 2005 silver Equinox, Gullett said that was not the car. Tr. 1324. Collins also admitted that the gunshot residue had to be on Cook at the time of his arrest on February 8. Tr. 1327. Collins also admitted that the timed route of Speedway, the scene of the shooting, and McDonald's would be faster if Cook was driving significantly faster than the speed limit. Tr. 1331. Once the testimony of Collins was complete, the State rested its case.

*State v. Bertuzzi*, 2014 WL 6183075, at *2-21 (Ohio Ct. App.).

## PROCEDURAL HISTORY

State Court Conviction

In March 2012, a Marion County Grand Jury indicted Petitioner on: one count of aggravated murder in violation of Ohio Revised Code § 2903.01(A); one count of aggravated murder in violation of § 2903.01(B); one count of murder in violation of § 2903.02(A);one count of aggravated burglary in violation of § 2911.11(A)(1); one count of aggravated burglary in violation of § 2911.11(A)(2); one count of having weapons while under disability in violation of § 2923.13(A)(3); one count of having weapons while under disability in violation of § 2923.13(A)(2); one count of receiving stolen property in violation of § 2913.51(A); and one count of felonious assault in violation of § 2903.11(A)(2) (Ex. 1, Doc. 12-1, at 5-10). Several counts carried three-year firearm specifications, and repeat violent offender specifications. *See id.* at 10. Petitioner pleaded not guilty upon arraignment. *See* Ex. 37 (docket sheet).

The Marion County Grand Jury issued a supplemental indictment in September 2012, charging Petitioner with: two counts of tampering with evidence in violation of § 2921.12(A)(1); one count of possession of heroin in violation of § 2925.11(A)/(C)(6); and one count of aggravated possession of drugs in violation of § 2925.11(A)/(C)(1). (Ex. 2, Doc. 12-1, at 11-12). Petitioner pleaded not guilty to the supplemental indictment. (Ex. 3, Doc. 12-1, at 13).

On October 30, 2012, the state filed a motion for jury view of several locations. (Ex. 4, Doc. 12-1, at 14-15).

22

Prior to trial, the court granted the state's oral motion to dismiss Count 6 of the indictment (having weapons while under disability in violation of § 2923.13(A)(3)). (Ex. 5, Doc. 12-1, at 16). The trial court also granted the state's oral motion to join the two indictments for purposes of trial, except that Counts 26 and 27 (possession of heroin and aggravated possession of drugs) were severed. (Ex. 6, Doc. 12-1, at 17-18).

Trial began on January 14, 2013. *See* Ex. 7, Doc. 12-1, at 19. At the conclusion of the state's case, the trial court granted Petitioner's motion for judgment of acquittal on Counts 8 (receiving stolen property); 9 (felonious assault), 24 (tampering with evidence), and 25 (tampering with evidence). *See id.*

On January 23, 2013, the jury found Petitioner guilty of Count 1 (aggravated murder); Count 2 (aggravated murder); Count 3 (murder); and Count 4 (aggravated burglary), each with an attached three-year firearm specification. *See id.* The jury also found Petitioner guilty of Count 7 (having weapons while under disability). *See id.*

On January 29, 2013, the court found Counts 1-3 to be allied offenses of similar import, and Counts 4-5 to be allied offenses of similar import. *See id.* The state elected to proceed on conviction and sentencing on Counts 1 and 5. *See id.* The court found Petitioner guilty of the repeat violent offender specifications to Counts 1 and 5 and sentenced him to consecutive sentences of life without parole for aggravated murder (Count 1); eleven years for aggravated burglary (Count 5); and 36 months for having weapons while under disability (Count 7). *See id.* at 19-21. The trial court terminated Petitioner's period of post-release control imposed in an earlier case and sentenced him to an additional 1206 days in prison for committing a felony while on post-release control. *See id.* at 20.

Direct Appeal

In March 2013, Petitioner, through counsel, filed a timely notice of appeal. (Ex. 8, Doc. 12-1, at 23). In his brief, Petitioner asserted seven assignments of error:

1. Defendant-Appellant's conviction for aggravated murder is against  manifest weight of the evidence in violation of the Constitutions of Ohio and the United States.

2. Defendant-Appellant's conviction for aggravated burglary manifest weight  of the evidence [sic] in violation of the Constitutions of Ohio and the United States.

3. Defendant-Appellant's conviction for weapon under disability is against manifest weight of the evidence in violation of the Constitutions of Ohio and the United States.

4. Prosecutorial misconduct rendered Defendant-Appellant's trial fundamentally unfair in violation of the Constitutions of Ohio and the United States.

5. The trial court committed plain error by allowing highly prejudicial  hearsay testimony in violation of the Constitutions of Ohio and the United States.

6. Defendant-Appellant received prejudicially ineffective assistance of  counsel in violation of his Sixth and Fourteenth Amendment rights as well  as his rights under Section 10, Article I, Ohio Constitution.

7. The combination of the aforementioned errors are sufficient to call into question the validity of the verdict, preventing the Appellant from  obtaining the fair trial guaranteed by the Fifth and Sixth Amendments to  the U.S. Constitution as made applicable to the States by the Fourteenth Amendment, and Article One, Sections Ten and Sixteen of the Ohio  Constitution.

(Ex. 9, Doc. 15-1, at 2-3). The state filed a brief in response (Ex. 10, Doc. 12-1, at 62-95), and Petitioner filed a reply (Ex. 11, Doc. 12-1, at 96-111).

On February 10, 2014, the Third District Court of Appeals found that the sentencing judgment entry was incomplete and, because the trial court failed to dispose of all the charges in the sentencing entry (specifically, the repeat violent offender specifications), there was no final order for the court to review. (Ex. 12, Doc. 12-1, at 112-15). On February 21, 2014, the trial court

entered a *nunc pro tunc* sentencing entry to correct the error omitting language specifying that no additional sentence was imposed on the repeat violent offender specifications. (Ex. 13, Doc. 12-1, at 116-17).

Petitioner and the state then filed a joint application asking the appellate court to reconsider the dismissal of the appeal, noting the *nunc pro tunc* entry. (Ex. 14, Doc. 12-1, at 120-21). The appellate court granted the application and reinstated the appeal. (Ex. 15, Doc. 12-1, at 122-23).

On November 17, 2014, the appellate court overruled Petitioner's assignments of error and affirmed the judgment of the trial court. (Ex. 16, Doc. 12-1, at 124-89); *Bertuzzi*, 2014 WL 618307.

Petitioner, *pro se*, filed at timely notice of appeal in the Ohio Supreme Court (Ex. 17, Doc. 12-1, at 190). In his memorandum in support of jurisdiction, petitioner set forth the same seven propositions of law he had asserted to the appellate court. *See* Ex. 18, Doc. 12-1, at 191-261. On April 29, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (Ex. 19, Doc. 12-1, at 262).

Application to Reopen

Meanwhile, while his appeal was pending, Petitioner, *pro se*, fined an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B) on February 12, 2015. (Ex. 20, Doc. 12-1, at 263-67). He subsequently filed an Amended Application for Reopening on March 16, 2015. (Ex. 21, Doc. 12-2, at 5-9). In the amended application, he asserted appellate counsel as ineffective for failing to raise two assignments of error on direct appeal:

1. Jurors in this case were unlawfully allowed to view a house that was not owned by Appellant at the time the crime was allegedly committed.

2. Appellant was denied the effective assistance of counsel in several respects that can not [sic] lawfully be considered sound trial strategy.

*Id.*

On March 30, 2015, the appellate court found the additional issues raised "fail to show any genuine issue as to whether he was deprived of the effective assistance of counsel on appeal." (Ex. 22, Doc. 12-2, at 176).

On April 24, 2015, Petitioner filed a notice of appeal to the Ohio Supreme Court. (Ex. 23, Doc. 12-2, at 178). In his memorandum in support of jurisdiction, Petitioner set forth the same two propositions of law. *See* Ex. 24, Doc. 12-2, at 179-86. On July 8, 2015, the Ohio Supreme Court declined to accept jurisdiction over the appeal. (Ex. 25, Doc. 12-2, at 187).

Post-Conviction Petition

Also during the pendency of his direct appeal, Petitioner filed (or attempted to file) petitions for post-conviction relief. First, in October 2013, Petitioner submitted a petition for post-conviction relief to the trial court. *See* Doc. 12-2, at 234. The Marion County Common Pleas clerk of courts file stamped it with the date October 7, 2013. *Id.* On its face, the document stated it was a "Petition for Post-Conviction Relief" and bore Petitioner's trial court case number, and the name of the trial judge, but was captioned: "IN THE COURT OF APPEALS FOR MARION COUNTY, OHIO, THIRD APPELLATE DISTRICT." *Id.* This petition was then docketed in the appellate court on October 16, 2013. *See* Ex. 38, Doc. 12-2, at 315 (docket sheet). It was never docketed with the trial court. *See* Ex. 37, Doc. 12-2, at 311.

On March 24, 2014, Petitioner filed a *pro se* petition for post-conviction relief with the trial court. (Ex. 26, Doc. 12-2, at 188-95).[3] In it, he asserted five claims:

1. Ineffective assistance of counsel for: (a) failure to secure exculpatory video footage, and (b) failure to discuss discovery items/issues.

2. Clerical Docket Sheet Snafu

3. Affidavit of Ray Morrow

_____

3. Petitioner filed a duplicate Petition on June 23, 2014. (Ex. 27, Doc. 12-2, at 196-203).

4.   Juror Misconduct: Prior Knowledge of Victim

5.   Conflict with Evidence and Judgment

(Ex. 26, Doc. 12-2, at 188-92). On December 5, 2014, the trial court denied the petition as untimely filed. (Ex. 28, Doc. 12-2, at 204-08).

On January 5, 2015, Petitioner, *pro se* filed a notice of appeal with the appellate court. (Ex. 29, Doc. 12-2, at 209). In his brief, he asserted a single assignment of error: "The trial court erred in denying Appellant's post-conviction petition for the reasons cited in its entry." (Ex. 30, Doc. 12-2, at 216). As the issue presented for review, he asserted: "Does a trial court commit prejudicial error when it makes a ruling based upon a mistake in the filing procedures of the clerk." *Id.* On August 31, 2015, the appellate court affirmed the trial court's judgment. (Ex. 31, Doc. 12-2, at 226-30).

On October 19, 2015, Petitioner, *pro se*, filed an application for reconsideration. (Ex. 32, Doc. 12-2, at 231-33). On December 3, 2015, the appellate court found Petitioner's application for reconsideration untimely filed, and noted that even if it were timely filed, it failed to raise any error or issue not properly considered in the first instance. (Ex. 33, Doc. 12-2, at 235-36).

On February 26, 2016, Petitioner, *pro se*, filed a notice of appeal and motion for leave to file a delayed appeal in the Ohio Supreme Court. (Exs. 34-35, Doc. 12-2, at 237-39). On April 20, 2016, the Ohio Supreme Court denied Petitioner's motion and dismissed the case. (Ex. 36, Doc. 12-2, at 250).

### FEDERAL HABEAS CORPUS

The instant Petition was timely filed in June 2016, raising ten grounds for relief:

**GROUND ONE**: Prosecutorial misconduct rendered Defendant's trial fundamentally unfair in violation of the Constitutions Ohio and United States.

27

**Supporting Facts**: Any time a prosecutor exhibits misconduct, and such conduct is preserved on the record, as the case in the instant matter, Petitioner cannot be said to have a fair trial.

**GROUND TWO**: The trial court committed plain error by allowing highly prejudicial hearsay testimony in violation of the Con[s]titutions of Ohio and United States.

**Supporting Facts**: Prejudicial hearsay violated Petitioner's rights as Petit[i]oner has argued in his briefs to the court of appeals.

**GROUND THREE**: Defendant's [sic] received prejudicially ineffective assistance of counsel in violation of his Sixth and Fo[u]rt[]eenth Amendment rights, as well as his rights under Section 10, Article I, Ohio Constitution

**Supporting Facts**: Petit[i]oner was denied effective assistance of counsel consistent with the arguments submitted in the br[ie]f submitted to the below court.

**GROUND FOUR**: The combination of the aforementioned errors are sufficient to call into question the validity of the verdict, preventing the defendant from obtaining the fair trial gu[a]ranted by the Fifth and Sixth Amendments to the U.S. Cons[t]it[]ution as made applicable to the state by the Fourteenth Amendment and Article One, Sections Ten and Sixteen of the Ohio Constitution.

**Supporting Facts**: Cumulative errors denied Petitioner his right to fair trial.

**GROUND FIVE**: Appellant [sic] counsel was ineffective in not raising the following errors: Jurors in the case were unlawfully allowed to view a house that was not owned by Petitioner at the time the crime was allegedly committed. Petitioner was denied the effective assistance of counsel in several respects that can not [sic] lawfully be considered sound trial strategy.

**GROUND SIX**: Ineffective assistance of counsel.

**Supporting Facts**: (a) failure to secure exculpatory video footage; (b) failure t[o] discuss discovery items/issues

**GROUND SEVEN**: Clerical docket sheet snafu

**GROUND EIGHT**: Affidavit of Ray Morrow

28

GROUND NINE: Juror misconduct

GROUND TEN: Conflict with evidence and judgment

Supporting Facts: Once the acquital [sic] transpired (Petitioner's use of a 2005 Chevrolet Equinox "in committing the murder"[)] the purported nexus to any mur[]der was dissolved.

(Doc. 1). Respondent filed an Answer (Doc. 12), and Petitioner filed a Reply (Doc. 19).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean

the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

**DISCUSSION**

<u>Non-Cognizable Claims</u>

Respondent first argues, and the undersigned agrees, that to the extent any of Petitioner's claims allege violations of Ohio law or the Ohio state constitution, such claims are not cognizable in these proceedings. *See* 28 U.S.C. § 2254(a) (court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Only if a petitioner can show that the state law violation resulted in a denial of "fundamental fairness" at trial can such a violation serve as a foundation for federal habeas relief. *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). Violations of fundamental fairness are restricted to offenses against "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007).

Thus, to the extent Grounds One through Three assert violations of the Ohio constitution, such claims are not cognizable. To the extent they raise federal constitutional violations, they are discussed further below in the procedural default and merits sections.

30

Further, in Ground Four, Petitioner alleges cumulative error based on Grounds One through Three deprived him of due process. This Court must reject that claim because the Supreme Court has never held that cumulative errors may form the basis for issuance of a writ of habeas corpus. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Petitioner's cumulative error claim, therefore, is not cognizable on habeas corpus review. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).

**Grounds Seven and Ten**

Respondent also asserts Grounds Seven (clerical docket sheet snafu) and Ten (conflict with evidence and judgment) are not cognizable. However, as discussed below, the undersigned finds that these claims, even if cognizable, are procedurally defaulted.

Procedural Default

Respondent next contends Grounds One through Four, and Six through Ten, are procedurally defaulted. Petitioner responds that his claims are not defaulted, or that he can overcome any default. The undersigned agrees with Respondent that these claims are defaulted, and finds Petitioner cannot overcome the default.

Petitioners must exhaust state court remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b), (c). This requirement is satisfied when a petitioner has given "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

Related to exhaustion is the issue of procedural default. First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Lundgren v. Mitchell,* 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright*

*v. Sykes,* 433 U.S. 72, 87 (1977)); *see also Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006). Second, a petitioner may procedurally default a claim by failing to raise the claim in state court, and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan,* 526 U.S. at 847. In Ohio, this means a defendant must fairly present his constitutional claims on the record to the trial court, the court of appeals, and the Supreme Court of Ohio on direct appeal. *Caver v. Straub,* 349 F.3d 340, 346 (6th Cir. 2003).

To overcome procedural default a petitioner must establish: 1) "cause for the default," and 2) "actual prejudice from it." *Hall v. Vasbinder,* 563 F.3d 222, 236 (6th Cir. 2009). "To show cause for the default, a petitioner must show more than mere error, he must establish a substantial reason to excuse the default." *Id.* Cause "must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman v. Thompson,* 501 U.S. 722, 753 (1991).

A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Id.* at 750. The Supreme Court has held such an inquiry requires a petitioner "supplement[ ] a constitutional claim with a 'colorable showing of factual innocence.' " *McCleskey v. Zant,* 499 U.S. 467, 495 (1991) (quoting *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986)). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not

presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty". *Id.* (quoting *Stone v. Powell,* 428 U.S. 465, 492-93 (1976)). However, the Court has counseled the actual innocence exception "should remain rare and only be applied in the extraordinary case." *Souter v. Jones*, 395 F.3d 577, 590 (2005) (internal quotations and citations omitted).

*Grounds One Through Four*

Respondent first contends Grounds One through Four are procedurally defaulted because they were not "fairly presented" to the Ohio Supreme Court. This is so, Respondent contends, because Petitioner's memorandum to the Ohio Supreme Court was conclusory, with "[t]he argument portion of the memorandum addressing the claims in Grounds One through Four" occupying "just over one page." (Doc. 12, at 39).

A petitioner fairly presents the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. *Anderson v. Harless,* 459 U.S. 4, 6 (1982). The Sixth Circuit has held a petitioner fairly presents his federal claim to the state courts in one of four ways: (1) relying on federal cases employing constitutional analysis; (2) relying on state cases that employ federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts that are well within the mainstream of constitutional law. *Whiting v. Burt,* 395 F.3d 602, 613 (6th Cir. 2005).

To "fairly present" a claim to a state court, a Petitioner must present to the state courts the same facts and same legal theory as he seeks to present on federal habeas review. *See, e.g.*, *Lott v.*

33

*Coyle*, 261 F.3d 594, 607 (6th Cr. 2001). And, the Supreme Court has held, "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Here, Petitioner presented Grounds One through Four in his brief to the Ohio appellate court as assignments of error four (prosecutorial misconduct), five (hearsay/Confrontation Clause), six (ineffective assistance of counsel), and seven (cumulative error). (Ex. 9, Doc. 15-1, at 31-34). Each was accompanied by argument. *See id.* In his memorandum in support of jurisdiction to the Ohio Supreme Court, Petitioner listed these same claims as propositions of law (referencing the United States Constitution), but presented only conclusory statements and little argument. *See* Ex. 18, Doc. 12-1, at 195-96. Regarding his prosecutorial misconduct claim, Petitioner's entire argument was: "Any time a prosecutor exhibits misconduct, and such conduct is preserved on the record, as was the case in the instant matter, Appellant cannot be said to have a fair trial." *Id.* at 195. Regarding his hearsay (or confrontation clause) claim, Petitioner argued: "Prejudicial hearsay violated Appellant's rights as Appellant has argued in his briefs to the court of appeals." *Id.* Regarding his ineffective assistance of counsel claim, he again referenced his prior brief: "Appellant was denied effective assistance of counsel consistent with the arguments submitted in the brief submitted to the below court." *Id.* Finally, regarding his cumulative error claim, he simply stated: "Cumulative errors denied Appellant his right to a fair trial." *Id.* at 196.

At least one Circuit Court has found, relying on *Baldwin v. Reese*, 541 U.S. 27 (2004), that a claim is not fairly presented by referencing briefs submitted in a lower court. *Lockheart v. Hulick,* 443 F.3d 927, 929 (7th Cir. 2006) (holding that fair presentment "requirement is not met if a judge

must go outside the four corners of the document in order to understand the contention's nature and basis"). And, the Sixth Circuit has explained that passing references to constitutional rights are insufficient to fairly present a federal issue to the state court. "A petitioner need not cite chapter and verse of constitutional law, but general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated." *Blackmon v. Booker,* 394 F.3d 399, 400 (6th Cir. 2004) (citations omitted); *see also Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation); *Katt v. Lafler,* 271 F. App'x 479, 481 (6th Cir. 2008) (finding appellate claim that admission of hearsay "violated the rules of evidence [and] denied [the petitioner's] constitutional rights to due process and a fair trial. US Const, Ams V, VI, XIV" not sufficient for fair presentation). Further, the Sixth Circuit has explained that fair presentation requires a petitioner to present, to the state courts, "the specific legal *and factual basis* for the claim". *Wagner v. Smith*, 581 F.3d 410, 415-16 (6th Cir. 2009) (emphasis added); *see also Bechtol v. Prelesnik*, 568 F. App'x 441, 446-47 (6th Cir. 2014) ("Although Bechtol's argument heading addressed the same legal issue of witness intimidation constituting a due process violation, it does not adequately present the factual basis of this claim—that Ryan Hittle was intimidated.").

Here, although Petitioner's brief to the Ohio Supreme Court asserted federal claims in each assignment of error, it did so in a conclusory manner. *See* Ex. 18, Doc. 12-1, at 192-96 ("Prosecutorial misconduct rendered Defendant-Appellant's trial fundamentally unfair in violation of the Constitutions of Ohio and the United States"; "The trial court committed plain error by allowing highly prejudicial hearsay testimony in violation of the Constitutions of Ohio and the United States"; "Defendant-Appellant received prejudicially ineffective assistance of counsel in

35

violation of his Sixth and Fourteenth Amendment Rights"; "The combination of the aforementioned errors are sufficient to call into question the validity of the verdict, preventing the appellant form obtaining the fair trial g[ua]ranted by the Fifth and Sixth Amendments to the U.S. Constitution as made applicable to the states by the Fourteen Amendment"). As the Sixth Circuit has explained, such general allegations "do not fairly present claims that specific constitutional rights were violated." *Blackmon*, 394 F.3d at 400. Moreover, Petitioner did not elaborate on the factual basis supporting any of his claims, but simply referenced the briefs submitted to the state appellate court. *See id.*

> This is similar to the situation addressed by the Sixth Circuit in *Wagner*:
>
> As stated above, the specific legal and factual basis for the claim must be provided to the state court. *Frazier,* 343 F.3d at 797. Here, the heading arguably states the legal basis for the claim. *See Newton,* 349 F.3d at 877 (noting that a petitioner "need not 'recite book and verse on the federal constitution' " (quoting *Koontz v. Glossa,* 731 F.2d 365, 369 (6th Cir.1984))). The problem is that the heading fails to state, with any degree of specificity, the *factual* basis for the claim. This is not to say that appellants are required to state with exact specificity the factual nature of their claim in every heading of every brief. But Petitioner cannot rely on such a heading to show that he fairly presented the factual basis of this specific prosecutorial misconduct claim if the heading itself makes no mention of the [factual basis for the claim].

581 F.3d at 416. Here, in his memorandum to the Ohio Supreme Court Petitioner did not elaborate on the factual bases for any of his claims. *See* Ex. 18, Doc. 12-1, at 192-96. Because a state court is not required to "read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material", *Reese*, 541 U.S. at 32, Petitioner's references to his prior briefs is insufficient, *see Lockheart*, 443 F.3d at 929.[4] As in *Lockheart*,

---

4. The Seventh Circuit in *Lockheart* noted that "if state rules entitled litigants to present arguments by incorporation, then use of that approved device would preserve these issues. But Lockheart does not identify any rule of the Supreme Court of Illinois allowing this maneuver, and we could not find one." 443 F.3d at 929. Similarly here, Petitioner points to no Ohio Supreme Court rule

therefore, the Court is "left with *Baldwin*: only arguments in the main body of the [brief] have been preserved, and [Grounds One through Four] therefore ha[ve] been forfeited." 443 F.3d at 929. Therefore, these grounds are defaulted and cannot be considered unless Petitioner can show cause and prejudice, or a miscarriage of justice.

Petitioner does not argue cause and prejudice to overcome this default, but does allude to the miscarriage of justice exception. A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In his argument regarding Ground One, Petitioner argues "[t]he prosecutor also ignored significant evidence that Joey Miller or Cook, not Bertuzzi, was the murderer."(Doc. 19, at 25). He summarizes testimony from the trial he asserts supports this contention, *id.* at 25-27, and then contends "[w]ith all this testimony that Cook or Joey could be a suspect it is easy to see that Petitioner meets the standard of actual innocence", *id.*at 27. However, Petitioner points only to the trial testimony. He does not present "new reliable evidence" of innocence as required by *Schlup*. 513 U.S. at 324. As such, Petitioner's default cannot be excused by the miscarriage of justice exception.

For these reasons, the undersigned recommends the court find Grounds One through Four procedurally defaulted.[5]

*Grounds Six Through Ten*

Respondent next contends Grounds Six through Ten are procedurally defaulted due to Petitioner's failure to timely raise them before the state courts. Petitioner responds that he can

---

permitting arguments to be presented by incorporation, nor does the undersigned's review reveal any such rule.

5. Should the court disagree with the default analysis, the undersigned alternatively addresses the merits of Grounds One through Three below. Ground Four is also non-cognizable, as explained above.

overcome the default. The undersigned recommends the court find these grounds procedurally defaulted.

These claims were raised in Petitioner's attempt to file a post-conviction petition with the state court (Ex. 26, Doc. 12-2, at 188-95), but dismissed as untimely-filed by the trial court (Ex. 28, Doc. 12-2, at 204-08). In affirming the trial court's dismissal of the post-conviction petition as untimely, the appellate court explained:

> The trial transcripts were filed with this Court on April 12, 2013 in the direct appeal of the judgment of conviction and sentence. The 180-day deadline for Bertuzzi's petition was October 9, 2013. In its judgment entry dismissing Bertuzzi's petition, the trial court noted that the docket in appellate case number 9-13-12 indicates that Bertuzzi filed a petition for postconviction relief with the Court of Appeals on October 16, 2013—seven days past the expiration of the statutory deadline. Bertuzzi acknowledges that he improperly captioned the petition in the Court of Appeals instead of in the Court of Common Pleas. As also noted by the trial court in its judgment entry, the petition was subsequently dismissed for being improperly captioned.
>
> Notably, neither the October 16, 2013 petition nor the dismissal of the petition is in the record of these proceedings assigned to appellate case number 9-15-01. Rather, it appears from the trial court's judgment that those documents were filed in appellate case number 9-13-12, which is not the subject of this appeal. The only petitions of record for our review are the petitions filed on March 24, 2014 and June 23, 2014—both of which are untimely. [footnote omitted]. Nevertheless, Bertuzzi has failed to demonstrate that he filed a petition for postconviction relief within the 180-day timeframe as required by the statute. Therefore, we find no error with the trial court's decision to dismiss the petition.

(Ex. 31, Doc. 12-2, at 228-29).[6]

In view of the appellate court's decision affirming the trial court's dismissal of Petitioner's post-conviction petition as untimely, this Court concludes that Petitioner has procedurally

---

6. In a footnote, the appellate court elaborated: "There is no judgment entry overruling the March 24, 2014 petition and it is not clear from the record why the trial court did not mention it in its December 5, 2014 judgment. However, the issue is moot because the March 24, 2014 petition was identical to the June 23, 2014 petition and was also filed outside the 180-day timeframe." (Ex. 31, Doc. 12-2 at 229 n.2).

defaulted Grounds Six through Ten that he now presents for review in these proceedings. *See, e.g.,* *Gunner v. Welch,* 749 F.3d 511, 515-16 (6th Cir. 2014) (the petitioner procedurally defaulted his claim by failing to file a timely petition for post-conviction relief); *Foster v. Warden, Chillicothe Correctional Inst.,* 575 F. App'x 650, 653 (6th Cir. 2014) (same). Therefore, the merits of these claims cannot be considered unless Petitioner can show cause for, and prejudice resulting from, the default.

As cause, Petitioner asserts the same filing error he asserted to the state court. Specifically, he contends "the Marion County Clerk of Courts refused to file Petitioner's Petition for Post-Conviction Relief file stamped on Oct 7, 2013 . . . , but instead claimed in the docket that the petition was filed on October 16, 2013." (Doc. 19, at 40-41). As described above, Petitioner submitted a petition for post-conviction relief to the trial court in October 2013, which was included his trial court case number but was captioned: "IN THE COURT OF APPEALS FOR MARION COUNTY, OHIO, THIRD APPELLATE DISTRICT". *See* Doc. 12-2, at 234. The Marion County Common Pleas Court clerk of courts file stamped it with the date October 7, 2013. *Id.* This petition was then docketed in the appellate court on October 16, 2013. *See* Ex. 38, Doc. 12-2, at 315 (docket sheet). It was never docketed with the trial court. *See* Ex. 37, Doc. 12-2, at 311.

Petitioner attempts to lay the blame with the clerk of court, arguing that "the clerk of courts of Marion County should have known that Ohio Revised Code 2953.21 calls for Petitions for Post-Conviction Relief to be filed in the Court of Common Pleas, not the Court of Appeals as the Marion County Clerk of Courts misfiled this petition in the Third District Court of Appeals on October 16, 2013." *Id.* at 40. As the state court found, however, Petitioner also admits he mis-captioned the pleading. (Ex. 31, Doc. 12-2, at 229).

Thus, Petitioner has not shown "something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. Rather, it was his own mis-captioning of the pleading that led to its delayed filing in the incorrect court. And, it is well-established that a petitioner's lack of legal knowledge, or *pro se* status, is insufficient to serve as cause to overcome default. *See Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

Further, even assuming this could serve as cause to overcome this initial default, Petitioner committed a second default when he failed to file a timely appeal of the denial of his post-conviction petition to the Ohio Supreme Court. *See* Exs. 34-35, Doc. 12-2, at 237-39 (notice of delayed appeal and motion in support). The appellate court affirmed the trial court's judgment (finding the post-conviction petition untimely filed) on August 31, 2015. (Ex. 31, Doc. 12-2, at 226-30). Thus, pursuant to Ohio rules, Petitioner had until October 15, 2015 to file an appeal of that decision. *See* Ohio Sup. Ct. Prac. R. 7.01(A). He did not do so.

Rather, on October 19, 2015, Petitioner filed a motion for reconsideration. (Ex. 32, Doc. 12-2, at 231-33). The state appellate court found the reconsideration motion untimely filed, and, alternatively, meritless. *See* Ex. 33, Doc. 12-2, at 235-36. And, ultimately, on February 26, 2016, Petitioner filed his notice of appeal and motion for leave to file a delayed appeal with the Ohio Supreme Court. (Exs. 34-35, Doc. 12-2, at 237-39).

Two Ohio Supreme Court rules come into play here. First, delayed appeals in post-conviction proceedings are not permitted. *See* Ohio Sup. Ct. Prac. R. 7.01(A)(4)(c). Second, a "timely filed" application for reconsideration tolls the time for filing a notice of appeal with the Ohio Supreme Court. Ohio Sup. Ct. Prac. R. 7.01(A)(5)(a). Here, the appellate court found

Petitioner's motion for reconsideration *untimely*. *See* Ex. 33, Doc. 12-2, at 235-36.[7] Thus, it could not toll the time period during which Petitioner was required to file his appeal. The Sixth Circuit has found a state's interest in setting reasonable time limits on post-conviction petitions to be an adequate and independent ground for default. *See Carroll v. Coyle*, 1999 WL 617962, at *2 (6th Cir.) (table). Finally, failure to present an issue to all levels of the state court constitutes procedural default. *O'Sullivan*, 526 U.S. at 848. As such, Petitioner has committed a second default of Grounds Six through Ten.

As cause for this default, Petitioner asserts his appeal of his post-conviction petition "was delayed by Warren Correctional Institution violating Ohio Department of Rehabilitation and Correction Policy for Legal Mail by not crediting Petitioner $0.30 to mail out his Petition to the Ohio Supreme Court, he could not get a ruling on his appeal." (Doc. 19, at 41). However, a review of Petitioner's motion for delayed appeal reveals that the postage issue occurred long after the October 15, 2015 deadline. *See* Ex. 35, Doc. 12-2, at 138 (relaying unsuccessful attempts to mail appeal in January 2016). Thus, Petitioner's postage problems cannot serve to excuse his failure to meet the October 15, 2015 deadline.[8]

---

7. Where, as here, a state court decision rests its decision on both a procedural bar, and alternatively on the merits, the procedural default is deemed invoked. *See Harris v. Reed*, 489 U.S. 255, 262-63 (1989).

8. Further, as to Petitioner's objection that each level of the Ohio court ""violated" or "ignored" the "federal mailbox rule" (Doc. 19, at 42-43), such rule is not applied by Ohio Courts. *See Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 753 (6th Cir. 2011) (noting that under Ohio's procedural rules, a document is not deemed filed until the clerk of court's office files the document); *see also Foster v. Warden, Chillicothe Corr. Inst.*, 575 F. App'x 650, 653-54 (6th Cir. 2014) ("Ohio does not follow the federal 'prison mailbox rule'; it has a strict filing deadline that generally prevents its state courts from hearing an untimely petition."). Moreover, Petitioner has not explained how the mailbox rule would have benefitted him and avoided any of the above defaults.

Petitioner thus did not "fairly present" Grounds Six through Ten to all levels of the Ohio Courts. And he has not shown cause and prejudice. As such, these grounds are defaulted.

Merits

The undersigned next turns to the merits of Ground Five (in the first instance), and Grounds One, Two, and Three (in the alternative).The undersigned recommends the court find all four grounds fail on the merits.

*Ground Five: Ineffective Assistance of Appellate Counsel*

In Ground Five, Petitioner alleges appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel, and a claim regarding the jury view. Petitioner properly raised this claim in his application for reopening (Ex. 21, Doc. 12-2, at 5-9), and appealed to the Ohio Supreme Court (Ex. 24, Doc. 12-2, at 179-86), and thus it is preserved for federal habeas review.

The Supreme Court long has recognized that the Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system." *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342–44 (1963). The Court announced a two-prong test for habeas claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quoting *Strickland,* 466 U.S. at 689–90). The Supreme Court has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington v. Richter,* 562 U.S. 86, 105 (2011).

The Supreme Court further has held a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Petitioner must demonstrate appellate counsel's performance was deficient, and the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *Strickland,* 466 U.S. at 687.

An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750–54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted). Further, judicial review of an ineffective assistance of counsel claim through the lens of § 2254(d)(1) is "doubly deferential". *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Here, the state appellate court considered Petitioner's ineffective assistance of appellate counsel claim and concluded:

> Upon consideration the Court finds that the additional issues raised in Appellant's application fail to show any genuine issue as to whether he was

43

deprived of the effective assistance of counsel on appeal. App.R. 26(B)(5). *State v. Reed*, 74 Ohio St.3d 534 (1996), applying the analysis of *Strickland v. Washington*, 466 U.S. 668 (1984). See, also, *State v. Bradley*, 42 Ohio St.3d 136 (1989).

Seven assignments of error were raised on direct appeal challenging most aspects of the conviction and sentence, including manifest weight of the evidence and ineffective assistance of trial counsel. We find that appellate counsel was not ineffective for failing to raise the additional issues set forth by Appellant. It was plausible and, in fact, a reasonable tactic to avoid such speculative and/or improper challenges. App.R. 26(B)(5). Accordingly, the application is not well taken.

(Ex. 22, Doc. 12-2, at 176-77).

Under the doubly deferential standard of review applied to an ineffective assistance of counsel claim on habeas review, *Knowles*, 556 U.S. at 123, Petitioner's claim must fail. That is, the state court reasonably concluded that appellate counsel was not required to raise all issues on appeal, counsel raised and argued several issues, and it was a reasonable decision by counsel not to raise the additional claims of error asserted by Petitioner. *See Jones*, 463 U.S. at 750-54; *Perry*, 908 F.2d at 59; *Joshua*, 341 F.3d at 441. This is particularly so given the Ohio appellate court's conclusion that the additional claims Petitioner wished counsel to raise were "speculative and/or improper." (Ex. 22, Doc. 12-2, at 176). That is, in addition to being unable to show counsel's performance was deficient, Petitioner also cannot show prejudice—that is, he cannot show the result on appeal would have been different. Thus, Petitioner has not shown the state court's decision was contrary to, or an unreasonable application of, federal law (here, *Strickland*), and he is therefore not entitled to habeas relief.

Because Petitioner has not shown the state court's decision was contrary to, or an unreasonable application of, federal law, this claim fails.

*Grounds One and Two: Prosecutorial Misconduct; Confrontation Clause*

As they are related, these two grounds will be addressed together. In Ground One, Petitioner argues prosecutorial misconduct rendered his trial "fundamentally unfair in violation of the Constitutions [of] Ohio and [the] United States." (Doc. 1, at 5). In Ground Two, petitioner argues "[t]he trial court committed plain error by allowing highly prejudice[i]al hearsay testimony in violation of the Con[s]titutions of Ohio and United States." (Doc. 1, at 6). Respondent contends these grounds—even if not defaulted as outlined above—fail on the merits. The undersigned agrees.

Petitioner raised a these claims to the state appellate court. (Ex. 9, Doc. 15-1, at 31-33). There, he argued the prosecutor asked several improper questions designed to elicit improper hearsay, and in fact elicited such hearsay. *Id.* at 57-58.[9] The state appellate court addressed these claims together in its decision:

> {¶ 94} The fourth and fifth assignments of error are related and will thus be discussed together. In the fifth assignment of error, Bertuzzi claims that the trial court erred by allowing the admission of hearsay evidence. Bertuzzi alleges in the fourth assignment of error that the prosecutor committed prosecutorial misconduct by eliciting hearsay statements from witnesses. A trial court has broad discretion over the admission of evidence and its judgment shall not be reversed on appeal absent an abuse of that discretion. *State v. Hancock,* 108 Ohio St.3d 57, 2006–Ohio–160, 840 N.E.2d 1032. "For an abuse of discretion to have occurred, the trial court must have taken action that is unreasonable, arbitrary, or unconscionable." *Estate of Johnson v. Randall Smith, Inc.,* 135 Ohio St.3d 440, 2013–Ohio–1507, 989 N.E.2d 35, ¶ 22. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay statements are inadmissible unless they meet one of the listed exceptions. Evid.R. 802. By definition, the following are not hearsay statements.

9. In his Reply, Petitioner points to additional actions he alleges constitute prosecutorial misconduct and additional hearsay/Confrontation Clause claims. *See* Doc. 19, at 24-29. Because the factual basis for these claims was not raised before the state courts, such claims are defaulted. *See* Wagner, 581 F.3d at 415-16 (fair presentation requires a petitioner to present, to the state courts, "the specific legal *and factual basis* for the claim") (emphasis added).

> **(2) Admission by party-opponent. The statement is offered against a party and is (1) the party's own statement, in either an individual or a representative capacity, or (b) a statement of which the party has manifested an adoption or belief in its truth * * *.**

Evid.R. 801(D)(2).

> **The foregoing rule provides that an out-of-court statement is not hearsay if it is offered against a party at trial and is "a statement of which the party has manifested an adoption or belief in its truth[.]" A defendant may demonstrate his adoption of a nonparty's out-of-court statement through his demeanor, conduct, words, or even silence.** *State v. Clark* **(Sept. 8, 1993), Hamilton App. No. C–920603. "In order for an adoptive admission to be applicable, the declarant must have made the statement in the presence of the party against whom the statement is offered at trial. In addition, the party must have heard and understood the statement, must have been free to disavow it, and must have either expressly acknowledged the truth of the statement or remained silent when a reasonable person would have denied its truthfulness."** *State v. Comstock* **(Aug. 29, 1997), Ashtabula App. No. 96–A–0058.**

> **Staff notes following Evid.R. 801(D)(2)(b) similarly explain the rule as follows: "An adoptive admission, or an admission by acquiescence, consists of a statement by a non-party which may be deemed to be that of a party by virtue of the failure of the party to deny the statement. There are obvious risks in attributing a statement of a third person to be that of a party and, in applying the rule, courts have been careful to consider the circumstances under which the utterance is made to insure that the party understood the utterance, that he was free to make a response, and that a reasonable person would have denied the statement. Absent these determinations, a statement of a third person cannot be an admission by acquiescence of a party opponent."**

*State v. Gibson,* 2d Dist. Greene No. 09–CA–05, 2010–Ohio–1121, ¶ 15–16. *See also, State v. Hatter,* 6th Dist. Sandusky No. S–92–6, 1993 WL 77041.

{¶ 95} Bertuzzi argues in the fifth assignment of error that the statements by Lisa and Joey that Cook said Bertuzzi killed Aldrich for Cook were hearsay statements which should not have been admitted because they were statements of co-conspirators admitted prior to the determination that a conspiracy existed. Specifically, Lisa testified as follows.

46

> Q. [W]ho all was in the room?
> A. Myself, my husband [Joey], [Cook], and [Bertuzzi].
>
> \* \* \*
>
> Q. Was there any talk about the homicide?
> A. I just got questions from [Cook] as to how many shots did you hear.
> Q. What did you tell him?
> A. I said three, two real quick and one right after. And he would nod, look at [Bertuzzi]. [Bertuzzi] never spoke, but he just shook his head.
> Q. Would he nod his head?
> A. Yeah.
>
> \* \* \*
>
> Q. Did he ever give a reason why this happened?
> A. He just said that [his daughter] wasn't being taken away from him.
> Q. Did he mention anything about [Bertuzzi] doing anything for him?
> A. He said, I told you [Bertuzzi] would do anything for me.
> Q. When he said that, did [Bertuzzi] say anything, Hey, that's— I didn't do that?
> A. No.

Tr. 832–33. In this case, Bertuzzi was sitting in the room listening to the discussion concerning the shooting and nodding his head to Cook's statements. He did not deny that he was involved in the shooting when Cook implied that Bertuzzi did it for him. The record indicates that Bertuzzi could have denied his involvement and any reasonable person in that same circumstance would have denied his involvement in the crime. Since Bertuzzi did not deny them, the statements are adopted admissions and are thus, by definition, not hearsay statements.

{¶ 96} In addition, to these statements, Lisa and Joey testified that [Cook] told them that [Bertuzzi] had killed Aldrich out of loyalty to him. The record does not reveal that Bertuzzi was present for these statements, thus they are not adopted admissions. The State argues that they are statements made by a co-conspirator, which would be admissible pursuant to Evid.R. 801(D)(2)(e). "An out-of-court declaration of a co-conspirator is admissible and not hearsay when five elements are established: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was made in furtherance of the conspiracy." *State v.. Daniels,* 92 Ohio App.3d 473,

482, 636 N.E.2d 336 (1st Dist.1993). *See also State v. Pate,* 3d Dist. Hancock No. 5–96–14, 1996 WL 546872 (Sept. 26, 1996). Statements made after the crime may be in furtherance of the conspiracy if they are made to conceal the crime. *State v. Weimer,* 11th Dist. Lake No.2013–L–005, 2014–Ohio–2882, ¶ 40. *See also State v. Braun,* 8th Dist. Cuyahoga No. 91131, 2009–Ohio–4875 (holding that statements made after the crime bragging about it were not made in furtherance of the conspiracy). A review of the record does not indicate that the challenged statements that Bertuzzi killed Aldrich out of loyalty to Cook, which were made to Lisa and Joey at some time after the crime, were made in furtherance of the conspiracy.[6][10] Thus, they were not admissible as statements made by a co-conspirator.

{¶ 97} However, the admission of the statements was harmless error. The statements by Cook made in Bertuzzi's presence and adopted by Bertuzzi through his silence, as discussed above, indicated that Bertuzzi was involved in the crime and that he did it for Cook. In addition, Joey testified that Bertuzzi himself made the following admission.

> **A. [Bertuzzi] walked up to the house, kicked open the door, and she was sitting in a chair and stood up and he shot her.**
> **Q. How many times?**
> **A. Twice.**

Tr. 866. Lisa had also testified that the person she saw leaving the shooting looked like Bertuzzi in the way he walked and in his build. Given this evidence, there is other evidence that would convince the jury that Bertuzzi was the shooter beyond a reasonable doubt. Thus, the admission of the statements was harmless. The fifth assignment of error is overruled.

{¶ 98} Bertuzzi argues in the fourth assignment of error that the prosecutor engaged in misconduct by eliciting hearsay testimony and also by making improper statements during closing argument. As discussed above, the statements elicited by the prosecutor were hearsay statements. However, they were not prejudicial. Absent a showing of prejudice, there was no prosecutorial misconduct in that instance.

{¶ 99} Bertuzzi's next claim of prosecutorial misconduct involved the prosecutor asking Collins, who had been present for the entire trial, if he was persuaded by the defense's theory that Cook could have killed Aldrich rather than Bertuzzi. Collins responded in the negative. The jury is the sole decider of the facts, so it may have been improper for the prosecutor to ask Collins to state his opinion on guilt,

---

10. The footnote in the state court opinion read: "No context was given for the statements and no explanation as to why the statements were made was provided. The State merely asked the witnesses if [Cook] had told them why [Bertuzzi] killed Aldrich. Without some sort of context, there was no furtherance of the conspiracy." *Bertuzzi*, 2014 WL 6183075, at *24 n.6.

however any error would be harmless. The jury was properly instructed by the trial court that it was the sole determiner of the facts.

> **The Court and the jury have separate functions. You decide the disputed facts and I provide you with the instructions of law.**

> **\* \* \***

> **To weigh the evidence you must consider the credibility of each witness who testified. You will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand, their manner of testifying, the reasonableness of the testimony, the opportunity the witness had to see, hear, and know the things concerning which they testified, their accuracy of memory, frankness or lack of it, intelligence, interest and bias, if any, together with all the facts and circumstances surrounding their testimony.**

> **Applying these tests you will assign the testimony of each witness such weight as you deem proper. You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness.**

> **It is within your province to determine what testimony is worthy of belief and what testimony is not worthy of belief. The interest and bias of a witness, if any, may be considered by you in applying these tests the Court has just outlined. If you determine bias or interest exists on the part of a witness, you then should examine their testimony in light of that bias or interest. You may believe or disbelieve the testimony in whole or in part even though you may find that the witness had some interest or bias in the outcome of the case.**

Tr. 1582, 1585–87. Since the jury was properly instructed on the law, any error would be harmless.

{¶ 100} Bertuzzi also claims misconduct because of statements made by the prosecutor during closing arguments. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he prosecution must avoid insinuations and assertions which are calculated to mislead the jury." *Id.* In cases of clear misconduct, a mere instruction that closing arguments are not evidence is insufficient to remedy the error. *Id.* at 15. Additionally, "[w]e will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt

that the jury would have found the defendant guilty even without the improper comments." *State v. LaMar,* 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 121, 767 N.E.2d 166. Improper closing arguments must be viewed in the context of the entire trial. *Id.* at ¶ 168.

{¶ 101} Here, Bertuzzi argues that the prosecutor committed misconduct. Specifically, Bertuzzi takes issue with two different statements during argument.

> **Those are the facts. Not speculation, facts. And Detective Troutman, I've gone through a little bit about the police aren't going to lie for Bo Cook and say there was a delay if there wasn't. What's Detective Troutman's motive? Is he just a liar? Because again, to find the Defendant not guilty, you're going to have to find that our witnesses are liars and none of our evidence means anything.**

Tr. 1560.

> **They talked about they didn't test for GSR. They talked about Troutman's the only one telling you there was a two-minute delay. Remember in voir dire when I asked everybody, do you understand who's on trial here? The defendant's on trial. The police aren't on trial and the witnesses aren't on trial. And you all said yes, you understood that. Now you see why we say that because who are they trying to put on trial? The police and the witnesses. The defendant's on trial.**

Tr. 1572–73. Bertuzzi argues that these statements were improper because they insinuated that it was improper for the jury to determine the validity of the testimony. As discussed above, the jury was properly instructed that it was the finder of facts and that it could believe all, some, or none of a witness' testimony. The trial court also instructed the jury that closing arguments are not evidence. "The evidence comes from the witness stand, but the closing arguments of counsel are designed to assist the jury and gives the counsel an opportunity to review some of that evidence and argue what they believe to be reasonable inferences that you should find from that evidence." Tr. 1435. Placing the above statements in context of the entire trial and considering the jury instructions about weighing the evidence, this court does not find the statements to be improper or to have prejudiced the fairness of the trial. For all of the above reasons, the fourth assignment of error is overruled.

*Bertuzzi*, 2014 WL 6183075, at *22-26 (emphasis and alteration in original).

*Ground Two: Confrontation Clause*

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. This is a "'procedural rather than a substantive guarantee. It comments, not that evidence be reliable, but that reliability be assessed in particular manner: by testing in the crucible of cross-examination.'" *Haliym v. Mitchell*, 492 F.3d 680, 701 (6th Cir. 2007) (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004). In *Crawford*, the Supreme Court held the Confrontation Clause bars the admission of testimonial statements made by witnesses out of court unless the declarant is unavailable and the accused has had a previous opportunity to cross-examine the witness. 541 U.S. at 68-69. A statement is testimonial if a reasonable person in the declarant's position would have anticipated the use of the statement in a criminal proceeding. *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). "[T]o constitute a Confrontation Clause violation, the statement must be used as hearsay – in other words, it must be offered for the truth of the matter asserted." *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (internal quotations and citations omitted).

Further, violations of the Confrontation Clause are subject to harmless error analysis. *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007). To determine if a Confrontation Clause violation is harmless, "courts consider such factors such as 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case.'" *Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, the state appellate court held that one set of challenged statements were "adopted admissions and . . . thus, by definition, not hearsay statements." *Bertuzzi*, 2014 WL 6183075, at *24. And, although the other statements were hearsay (and not, as the state asserted, statements in furtherance of a conspiracy), and the state court held the admission thereof "was harmless error" in light of the other evidence in the case. *Id.* The state court opinions were not contrary to, or an unreasonable application of, federal Confrontation Clause law. First, the Ohio court characterized the first set of statements as adoptive admissions. Adoptive admissions are permissible under Ohio evidence laws, and this Court defers to state courts' determinations of their own law. The Sixth Circuit has ruled that adoptive admissions do not violate the Confrontation Clause, *see United States v. Jinadu*, 98 F.3d 239, 244-47 (6th Cir. 1996), and the Supreme Court has not ruled to the contrary. Thus, there is no confrontation clause violation with regard to the first set of challenged statements. Second, the state court's determination regarding the harmlessness of the admission of hearsay statements wherein "Lisa and Joey testified that [Cook] told them that [Bertuzzi] had killed Aldrich out of loyalty to him" *Bertuzzi*, 2014 WL 6183075, at *24, is not contrary to or an unreasonable application of federal law. The state court found that these statements were, in essence, cumulative of: the properly-admitted adoptive admission by Petitioner, and other testimony by Joey that Petitioner himself admitted the murder, and Lisa's testimony that the person leaving the shooting looked like Petitioner. *See Bertuzzi*, 2014 WL 6183075, at *24. The state court's determination that the admission of these statements was harmless is not contrary to, or an unreasonable application of federal law. *See Vasquez*, 496 F.3d at 574. That is, even assuming a Confrontation Clause violation here, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) at 623. As such, Ground Two fails.

*Ground One: Prosecutorial Misconduct*

To succeed on a prosecutorial misconduct claim, Petitioner must show that the Ohio Court of Appeals' decision on direct review was an unreasonable application of *Darden v. Wainwright,* 477 U.S. 168 (1986). *Darden* held the relevant question in a prosecutorial misconduct case is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks omitted). Moreover, "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise." *Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir. 2006) (internal quotation marks and alterations omitted). Indeed, because "the *Darden* standard is a very general one," courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews,* 567 U.S. 37, 48 (2012) (internal quotation marks omitted); *see also Key v. Rapelje*, 634 F. App'x 141, 146 (6th Cir. 2015). Further, even if prosecutorial misconduct rising to the level of constitutional error is established, a Petitioner must show prejudice to warrant habeas relief. *See West v. Bell*, 550 F.3d 542, 562 (6th Cir. 2008); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 588-89 (6th Cir. 2009). The prejudice standard requires a court to ask "whether the error had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. If not, the error is harmless and a petitioner will not be entitled to habeas relief. Moreover, a state court's harmless error analysis is subject to deference under § 2254(d). *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015).

The state court's analysis of Petitioner's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of federal law. First, as to the prosecutor's questioning of Collins about the defense theory, and the prosecutor's statements during closing argument, the

state court reasonably found such statements (regardless of any impropriety) to be harmless. This is so because jurors are presumed to follow their instructions, *see, e.g., Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005), and as the state court found, the jury was properly instructed by the trial court that it was the fact-finder and that arguments were not evidence, *Bertuzzi*, 2014 WL 6183075, at *25-26. Moreover, the state court's finding that the prosecutor's statements during closing argument had not "prejudiced the fairness of the trial" was not unreasonable given the context of the entire trial and the evidence presented. Further, as to Petitioner's argument regarding prosecutorial misconduct in eliciting hearsay testimony, because—as discussed above—the state court reasonably found any such error harmless, Petitioner cannot show prejudice. Finally, as set forth in great detail in the state court opinion, there was substantial evidence from which a jury could find Petitioner guilty beyond a reasonable doubt. *See Bertuzzi*, 2014 WL 6183075, at *7-21, 27-28 (summarizing the facts presented at trial and addressing manifest weight arguments presented to state court); 28 U.S.C. § 2254(e)(1). Thus, the undersigned finds the state court's conclusion that these instances of alleged prosecutorial misconduct did not prejudice petitioner, or render the trial unfair, is not contrary to or an unreasonable application of federal law. As such, Ground One fails.

*Ground Three: Ineffective Assistance of Trial Counsel*

In Ground Three, Petitioner argues ineffective assistance of trial counsel "consistent with the arguments submitted in the br[ie]f submitted to the below court." (Doc. 1, at 7). Respondent contends this ground—even if not defaulted—fails on the merits. Petitioner responds with a merits-

based argument.[11] The undersigned agrees with Respondent that Petitioner is not entitled to relief on Ground Three.

To the state appellate court, Petitioner argued trial counsel was ineffective for 1) failing to object to alleged prosecutorial misconduct, and 2) not advancing an argument about the credibility of Joey and Lisa Miller (which Petitioner raised in his first assignment of error). *See* Ex. 9, Doc. 15-1, at 27-30. The state appellate court first rejected Petitioner's argument about the manifest weight of the evidence in his first assignment of error (which related to Joey and Lisa Miller):

> {¶ 102} The first three assignments of error all allege that the verdicts of the jury was against the manifest weight of the evidence. The question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.
>
> > **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.**"
>
> *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 514 (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id.* Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.
>
> > **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and**

---

11. Again, to the extent Petitioner presents arguments regarding ineffective assistance of trial counsel based on different facts than those presented to the state court, see Doc. 19, at 29-36, such claims were not fairly presented to the state courts and are defaulted. *See Wagner*, 581 F.3d at 415-16 (fair presentation requires a petitioner to present, to the state courts, "the specific legal *and factual basis* for the claim") (emphasis added).

> **the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the factfinder.**

*State v. Thompson,* 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist.1998).

{¶ 103} In the first assignment of error, Bertuzzi argues that his conviction for aggravated murder is against the manifest weight of the evidence. To obtain a conviction for aggravated murder in violation of R.C. 2903.01, the State must prove that the defendant purposely and with prior calculation caused the death of another. The State presented evidence that Cook had a motive to kill Aldrich and had told Lisa that Bertuzzi would do anything for him. There were multiple text messages between Cook and Bertuzzi the day of the shooting. Video shows that Bertuzzi and Cook met at Cook's house the day of the shooting. Fitzpatrick testified that he saw Bertuzzi with Cook soon before the shooting holding a gun and later saw Bertuzzi driving the "get-away" car. Lisa testified that the person she saw leaving the scene of the shooting immediately after the shots was Bertuzzi based upon his build and the manner in which he carried himself. Joey testified that Bertuzzi stated that he had shot Aldrich. The letters from Cook imply that Bertuzzi was involved in the shooting. The shoes Bertuzzi was wearing when arrested were similar to those identified as being worn by the shooter. Bertuzzi was also wearing a black hooded jacket and jeans, which is similar to the attire worn by the shooter. Given all of this evidence, this court cannot conclude that the evidence weighs heavily against conviction. Thus, the conviction for aggravated murder is not against the manifest weight of the evidence and the first assignment of error is overruled.

*Bertuzzi*, 2014 WL 6183075, at *27 (emphasis in original).

The state appellate court then also rejected Petitioner's ineffective assistance of counsel

claim:

{¶ 107} In the sixth assignment of error, Bertuzzi alleges that he was denied effective assistance of counsel.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Hester* (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth**

> **Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."** *State v. Lytle* **(1976), 48 Ohio St.2d 391, 396– 397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**
>
> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent.** *See Vaughn v. Maxwell* **(1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; \*** *State v. Jackson,* **64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun,* 86 Ohio St.3d 279, 289, 1999–Ohio–102, 714 N .E.2d 905.

{¶ 108} Bertuzzi claims that counsel was ineffective for the reasons set forth in the above assignments of error. This court has reviewed those alleged errors and found no prejudicial error. Since any error could not have affected the outcome of the trial, trial counsel was not ineffective. The sixth assignment of error is overruled.

*Bertuzzi*, 2014 WL 6183075, at \*29 (emphasis in original).

As set forth above, in the discussion of Ground Five, ineffective assistance of counsel claims are subject to the two-prong test of *Strickland*. 466 U.S. at 687. First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Second, the petitioner must show he was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

First, based on the analysis above, Petitioner's claim that counsel was ineffective for failing to object to alleged prosecutorial misconduct necessarily fails because Petitioner cannot show prejudice. That is, because the state court reasonably found there was no prejudice resulting from any prosecutorial misconduct, Petitioner cannot show *Strickland* prejudice resulting from his counsel's failure to object thereto.

Second, Petitioner has not shown the state appellate court's finding he was not prejudiced by counsel's alleged errors is contrary to, or an unreasonable application of federal law. Petitioner argued trial counsel was ineffective for failing to raise the argument he raised in his first assignment of error to the appellate court. (Ex. 9, Doc. 15-1, at 33). Citing their trial testimony, this argument was centered around the credibility of Joey and Lisa Miller. *See id.* at 27-30. Here, the record reflects defense counsel cross-examined both witnesses:

> {¶ 53} On cross-examination, Lisa testified that she could not identify the shoes the shooter had been wearing. Tr. 849. She also testified that Cook wore hoodies all the time. Tr. 850. Lisa testified that she did not want to help the police because she was afraid of what Cook would do if he found out. Tr. 851. Lisa admitted that Cook would be willing to kill his own sister to avoid prison. Tr. 851. She also admitted that Bertuzzi was of average height and weight, so the description could match many people. Tr. 851–52.

* * *

> {¶ 56} On cross-examination, Joey testified that Cook's build is very similar to his own. Tr. 883. Joey also admitted that he had not volunteered to help the police. Tr. 877. Although Joey knew someone had been injured or killed, he did not call the police. Tr. 885.

*Bertuzzi*, 2014 WL 6183075, at *14.

Under the "doubly deferential" judicial review of an ineffective assistance of counsel claim under 28 U.S.C. § 2254(d)(1), *Knowles*, 556 U.S. at 123, the undersigned finds the state court determination that Petitioner cannot satisfy the prejudice prong of *Strickland* was not unreasonable. That is, he has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Specifically, he has not shown how the result would have changed had trial counsel engaged in a somehow more in-depth cross-examination of these witnesses. As such, Ground Three, even if not defaulted, fails on the merits.

Motions to Expand the Record or for Evidentiary Hearing

Throughout his Reply, Petitioner contends there is a need for an evidentiary hearing, or to expand the record or engage in discovery. *See* Doc. 19, at 29, 36, 37, 40, 45, 47, 49. For the reasons stated below, these requests are DENIED.

Rule 7 of the Rules Governing Section 2254 Cases provides that "the Court may direct the parties to expand the record by submitting additional materials relating to the petition.". "The decision of whether to expand the record, however, is within the sound discretion of the district court." *West v. Bell*, 550 F.3d 542, 551 (6th Cir.2008). Because "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," a federal habeas court may only review evidence in the record at the time of the state court proceedings. *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011). Review of claims the state court adjudicated on the merits are thus "'limited to the record that was before the state court.'" *Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011) (quoting *Pinholster, supra* 563 U.S. at 18).

And, no discovery is available as to defaulted claims. *E.g., Foster v. Brunsman*, 2010 WL 3604453, *1 (S.D. Ohio); *Werber v. Milligan*, 2012 WL 1458103, *23 (N.D. Ohio) (discovery seeking to develop new evidence as to defaulted claims would be futile).

Thus, Petitioner is not entitled to discovery or evidentiary hearing on grounds the undersigned recommends the court find defaulted or non-cognizable. *See* Doc. 19, at 29 (Ground Two); 37 (Ground Four); 40 (Ground Seven); 45 (Ground Eight); 47-49 (Ground Ten). Further, Petitioner is not entitled to an evidentiary hearing on Ground Two, as the undersigned finds, even if that ground were not defaulted, it was reasonably rejected by the state courts. *See Pinholster*, 563 U.S. at 181.

**CONCLUSION AND RECOMMENDATION**

Grounds One through Three are non-cognizable, procedurally defaulted, or meritless. Ground Four is procedurally defaulted and non-cognizable. Ground Five fails on the merits. Grounds Six through Ten are procedurally defaulted. Following review, and for the reasons stated above, the Court recommends the Petition be DENIED in its entirety.


s/James R. Knepp, II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).